## RICHARDSON, COUNTY CLERK AND REGISTRAR OF VOTERS OF MENDOCINO COUNTY v. RAMIREZ ET AL.

No. 72–1589.   Argued January 15, 1974—Decided June 24, 1974

*Duncan M. James* argued the cause and filed briefs for petitioner.

*Martin R. Glick* argued the cause for respondents. With him on the brief were *Gene Livingston* and *Burton D. Fretz. Daniel Hays Lowenstein* filed a brief for respondent Brown, Secretary of State of California.*

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The three individual respondents in this case were convicted of felonies and have completed the service of their respective sentences and paroles. They filed a petition for a writ of mandate in the Supreme Court of California to compel California county election officials to register them as voters.[1] They claimed, on behalf of

---

*Evelle J. Younger,* Attorney General, *Iver E. Skjeie,* Assistant Attorney General, and *George J. Roth,* Deputy Attorney General, filed a brief for the State of California as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Chesterfield Smith* and *Daniel L. Skoler* for the American Bar Assn., and by *Philip L. Goar, A. L. Wirin,* and *Fred Okrand* for the American Civil Liberties Union of Southern California.

[1] The petition for a writ of mandate in the Supreme Court of California also named the California Secretary of State as a respond-

themselves and others similarly situated, that application to them of the provisions of the California Constitution and implementing statutes which disenfranchised persons convicted of an "infamous crime" denied them the right to equal protection of the laws under the Federal Constitution. The Supreme Court of California held that "as applied to all ex-felons whose terms of incarceration and parole have expired, the provisions of article II and article XX, section 11, of the California Constitution denying the right of suffrage to persons convicted of crime, together with the several sections of the Elections Code implementing that disqualification . . . , violate the equal protection clause of the Fourteenth Amendment." *Ramirez* v. *Brown,* 9 Cal. 3d 199, 216–217, 507 P. 2d 1345, 1357 (1973). We granted certiorari, 414 U. S. 816 (1973).

Article XX, § 11, of the California Constitution has provided since its adoption in 1879 that "[l]aws shall be made" to exclude from voting persons convicted of bribery, perjury, forgery, malfeasance in office, "or other high crimes." At the time respondents were refused registration, former Art. II, § 1, of the California Constitution provided in part that "no alien ineligible to citizenship, no idiot, no insane person, no person convicted of any infamous crime, no person hereafter convicted of the embezzlement or misappropriation of public money, and no person who shall not be able to read the Constitution in the English language and write his or her name, shall ever exercise the privileges of an elector

ent in his capacity of chief elections officer of the State of California. He did not join the petition for a writ of certiorari to this Court, and has filed a brief as a party respondent. Respondents here (petitioners below) also include, in addition to the three individual respondents, the League of Women Voters and three nonprofit organizations which support the interests of ex-convicts—Los Pintos, 7th Step Foundations, Inc. (California Affiliates), and Prisoners' Union.

in this State." [2]   Sections 310 and 321 of the California Elections Code provide that an affidavit of registration shall show whether the affiant has been convicted of "a felony which disqualifies [him] from voting." [3]   Sections 383, 389, and 390 direct the county clerk to cancel the registration of all voters who have been convicted of "any infamous crime or of the embezzlement or misappropriation of any public money." [4]   Sections 14240 and

---

[2] Proposition 7, passed at the November 7, 1972, general election, repealed former Art. II, § 1, of the California Constitution and added new Art. II, § 3:

"The Legislature shall prohibit improper practices that affect elections and shall provide that no severely mentally deficient person, insane person, person convicted of an infamous crime, nor person convicted of embezzlement or misappropriation of public money, shall exercise the privileges of an elector in this state."

The Supreme Court of California concluded that the new constitutional provision was no different in substance from the former one, and that it did not implicitly repeal the implementing sections of the California Elections Code challenged here.

[3] Section 310 of the California Elections Code provides in relevant part that "[t]he affidavit of registration shall show:

.        .        .        .        .

"(h) That the affiant is not disqualified to vote by reason of a felony conviction."

Section 321 sets the form of the registration affidavit, which includes the following: "10. I am not disqualified to vote by reason of a felony conviction."

[4] Section 383 of the California Elections Code provides:

"The county clerk shall cancel the registration in the following cases:

.        .        .        .        .

"(c) Upon the production of a certified copy of a subsisting judgment of the conviction of the person registered of any infamous crime or of the embezzlement or misappropriation of any public money. . . ."

Section 389 provides:

"The county clerk shall, in the first week of September in each year, examine the records of the courts having jurisdiction in case of

14246 permit a voter's qualifications to be challenged on the ground that he has been convicted of "a felony" or of "the embezzlement or misappropriation of public money."[5] California provides by statute for restoration of the right to vote to persons convicted of crime either

---

infamous crimes and the embezzlement or misappropriation of public money, and shall cancel the affidavits of registration of all voters who have been finally convicted of an infamous crime or of the embezzlement or misappropriation of public money. . . ."

Section 390 provides:

"The county clerk, on the basis of the records of courts in the county having jurisdiction of such offenses, shall furnish to the registrar of voters in a county where there is a registrar of voters, before the first day of September of each year, a statement showing the names of all persons convicted of infamous crimes or of the embezzlement or misappropriation of public money during the year prior to that first day of September, whose convictions have become final. The registrar of voters shall, during the first week of September in each year, cancel the affidavits of registration of such persons. The county clerk shall certify the statement under the seal of his office. . . ."

[5] Section 14240 of the California Elections Code (Supp. 1974) provides:

"A person offering to vote may be orally challenged within the polling place only by a member of the precinct board upon any or all of the following grounds:

.          .          .          .          .

"(g) That he has been convicted of a felony.

.          .          .          .          .

"On the day of the election no person, other than a member of a precinct board or other official responsible for the conduct of the election, shall challenge any voter or question him concerning his qualifications to vote. . . ."

Section 14246 (Supp. 1974) provides:

"If the challenge is on the ground that the person challenged has been convicted of a felony or that he has been convicted of the embezzlement or misappropriation of public money, he shall not be questioned, but the fact may be proved by the production of an authenticated copy of the record or by the sworn oral testimony of two witnesses."

30

by court order after the completion of probation,[6] or, if a prison term was served, by executive pardon after completion of rehabilitation proceedings.[7] California also provides a procedure by which a person refused

---

[6] Section 1203.4 of the California Penal Code (Supp. 1974) provides:

"(a) In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation, or in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under this section, the defendant shall, at any time after the termination of the period of probation, if he is not then serving a sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw his plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if he has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in either case, the court shall thereupon dismiss the accusations or information against the defendant and he shall thereafter be released from all penalties and disabilities resulting from the offense of which he has been convicted. The probationer shall be informed of this right and privilege in his probation papers. . . ."

[7] Section 4852.01 of the California Penal Code (1970) provides that a person convicted of a felony who was incarcerated may file, any time after his release from custody, a notice of intention to apply for a certificate of rehabilitation and pardon. It further provides, however:

"This chapter shall not apply to persons convicted of misdemeanors; to persons who have served time in county jails only; to persons serving a mandatory life parole; to persons committed under death sentences; or to persons in the military service."

Section 4852.13 of the California Penal Code (1970) provides:

"If, after hearing, the court finds that the petitioner has demonstrated by his course of conduct his rehabilitation and his fitness to exercise all of the civil and political rights of citizenship, the court shall make an order declaring that the petitioner has been rehabilitated, and recommending that the Governor grant a full pardon to the petitioner. Such order shall be filed with the clerk

registration may obtain judicial review of his disqualification.[8]

Each of the individual respondents was convicted of one or more felonies, and served some time in jail or prison followed by a successfully terminated parole. Respondent Ramirez was convicted in Texas; respondents Lee and Gill were convicted in California. When Ramirez applied to register to vote in San Luis Obispo County, the County Clerk refused to allow him to register. The Monterey County Clerk refused registration to respondent Lee, and the Stanislaus County Registrar of

of the court, and shall be known as a certificate of rehabilitation. The certificate shall show the date on which the original notice of intention to apply for a certificate was filed."

Section 4852.16 provides:

"The certified copy of a certificate of rehabilitation transmitted to the Governor shall constitute an application for a full pardon upon receipt of which the Governor may, without any further investigation, issue a pardon to the person named therein, except that, pursuant to Section 1 of Article VII of the Constitution, the Governor shall not grant a pardon to any person twice convicted of felony, except upon the written recommendation of a majority of the judges of the Supreme Court."

Section 4852.17 (Supp. 1974) provides:

"Whenever a person is granted a full and unconditional pardon by the Governor, based upon a certificate of rehabilitation, the pardon shall entitle the person to exercise thereafter all civil and political rights of citizenship, including but not limited to: (1) the right to vote . . . ."

[8] Section 350 of the California Elections Code (1961) provides:

"If the county clerk refuses to register any qualified elector in the county, the elector may proceed by action in the superior court to compel his registration. In an action under this section, as many persons may join as plaintiffs as have causes of action."

Respondents contended that pardon was not an effective device for obtaining the franchise, noting that during 1968–1971, 34,262 persons were released from state prisons but only 282 pardons were granted.

Voters (hereafter also included in references to clerks) refused registration to respondent Gill. All three respondents were refused registration because of their felony convictions.[9]

In May 1972 respondents filed a petition for a writ of mandate in the Supreme Court of California, invoking its original jurisdiction.[10] They named as defendants[11] below the three election officials of San Luis Obispo,

[9] Respondent Ramirez was convicted in Texas of the felony of "robbery by assault" in 1952. He served three months in jail and successfully terminated his parole in 1962. In February 1972 the San Luis Obispo County Clerk refused to allow Ramirez to register to vote on the ground that he had been convicted of a felony and spent time in incarceration. Respondent Lee was convicted of the felony of heroin possession in California in 1955, served two years in prison, and successfully terminated his parole in 1959. In March 1972 the Monterey County Clerk refused to allow Lee to register to vote on the sole ground that he had been convicted of a felony and had not been pardoned by the Governor. Respondent Gill was convicted in 1952 and 1967 of second-degree burglary in California, and in 1957 of forgery. He served some time in prison on each conviction, followed by a successful parole. In April 1972 the Stanislaus County Registrar of Voters refused to allow Gill to register to vote on the sole ground of his prior felony convictions.

[10] Paragraph VI of respondents' petition for mandamus states that the named "Petitioners bring this action individually and on behalf of all other persons who are ineligible to register to vote in California solely by reason of a conviction of a felony other than an election code felony." The remainder of the petition makes it clear that the class was further restricted to ex-felons, and the Supreme Court of California so treated it.

[11] We refer to the named "defendants" in the action in the Supreme Court of California, even though in that court they were actually denominated respondents according to California practice, and we refer to named "plaintiffs" in that court, even though they were actually there denominated as petitioners. We do this for convenience of reference, in order to avoid as much as possible confusion between reference to the position of the parties in the Supreme Court of California and their position here.

Monterey, and Stanislaus Counties who had refused to allow them to register, "individually and as representatives of the class of all other County Clerks and Registrars of Voters who have the duty of determining for their respective counties whether any ex-felon will be denied the right to vote." The petition for a writ of mandate challenged the constitutionality of respondents' exclusion from the voting rolls on two grounds. First, it was contended that California's denial of the franchise to the class of ex-felons could no longer withstand scrutiny under the Equal Protection Clause of the Fourteenth Amendment. Relying on the Court's recent voting-rights cases, respondents argued that a compelling state interest must be found to justify exclusion of a class from the franchise, and that California could assert no such interest with respect to ex-felons. Second, respondents contended that application of the challenged California constitutional and statutory provisions by election officials of the State's 58 counties was so lacking in uniformity as to deny them due process and "geographical . . . equal protection." They appended a report by respondent California Secretary of State, and the questionnaires returned by county election officials on which it was based. The report concluded that there was wide variation in the county election officials' interpretation of the challenged voting exclusions.[12]  The Su-

---

[12] The parties agree that the lack of uniformity is the result of differing interpretations of the 1966 Supreme Court of California decision in *Otsuka* v. *Hite*, 64 Cal. 2d 596, 414 P. 2d 412, which defined "infamous crime" as used in the California constitutional provisions.

The California Secretary of State's report noted that "[m]ost" of the 49 responding counties "have attempted to develop consistent criteria for determining which ex-felons shall be entitled to register. In some counties these policies have been formalized in writing, but

preme Court of California upheld the first contention and therefore did not reach the second one.

## I

Before reaching respondents' constitutional challenge, the Supreme Court of California considered whether a decision reached by the three county clerks not to contest the action, together with their representation to the court that they would henceforth permit all ex-felons whose terms of incarceration and parole had expired to register and vote, rendered this case moot. That court decided that it did not. The acquiescence of the three officials was in no way binding on election officials of the other 55 California counties in which respondents might choose to reside, and it was undisputed that there were many ex-felons among the residents of those counties who had been or would be refused registration on the ground challenged. Because the case posed a question of broad public interest, which was likely to recur and which should receive a statewide resolution, the court exercised its "inherent discretion to resolve the issue, 'even though an event occurring during its pendency would normally render the matter moot.' . . . This rule is particularly applicable to challenges to the validity of election laws." 9 Cal. 3d, at 203, 507 P. 2d, at 1347. In addition to California cases, the court cited *Roe* v. *Wade,* 410 U. S. 113 (1973), and *Goosby* v. *Osser,* 409 U. S. 512 (1973).

in most instances a case-by-case method has been used." The report concluded:

"2. Although the policy within most counties may be consistent, the fact that some counties have adopted different policies has created a situation in which there is a lack of uniformity across the state. It appears from the survey that a person convicted of almost any given felony would find that he is eligible to vote in some California counties and ineligible to vote in others.

"3. In order to remedy this lack of uniformity, authoritative guidelines from either the legislature or the courts are urgently needed."

As a practical matter, there can be no doubt that there is a spirited dispute between the parties in this Court as to the constitutionality of the California provisions disenfranchising ex-felons. Even though the Supreme Court of California did not in fact issue a permanent writ of mandate, and therefore its judgment is in effect a declaratory judgment, an action for such relief may stem from a controversy that is "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Insurance Co.* v. *Haworth,* 300 U. S. 227, 240–241 (1937). By reason of the special relationship of the public officials in a State to the court of last resort of that State, the decision of the Supreme Court of California, if left standing, leaves them permanently bound by its conclusion on a matter of federal constitutional law. Cf. *North Dakota Pharmacy Bd.* v. *Snyder's Stores,* 414 U. S. 156 (1973).

This case in some respects presents stronger arguments for concluding that a live case or controversy remains than in other election cases in which we have addressed the question of mootness. Unlike *Moore* v. *Ogilvie,* 394 U. S. 814 (1969), in which the particular candidacy was not apt to be revived in a future election, or *Hall* v. *Beals,* 396 U. S. 45 (1969), in which the voters who had been disenfranchised because of a residence requirement would not have suffered the same fate under the amended statute, respondents here are indefinitely disenfranchised by the provisions of California law which they challenge. While the situation in *Moore* v. *Ogilvie, supra,* was described as " 'capable of repetition, yet evading review,' " 394 U. S., at 816, that involved here can best be described, in view of the Supreme Court of California's decision against the state officials and their obligation to follow the law as laid down by that court, as "incapable of repetition," and therefore evading review. There are thus the strongest sorts of practical arguments, as well as the lan-

guage of *Moore* v. *Ogilvie, supra,* which militate against a conclusion of mootness in this case.

But purely practical considerations have never been thought to be controlling by themselves on the issue of mootness in this Court. While the Supreme Court of California may choose to adjudicate a controversy simply because of its public importance, and the desirability of a statewide decision, we are limited by the case-or-controversy requirement of Art. III to adjudication of actual disputes between adverse parties.

The mootness problem here arises because, as it noted, the Supreme Court of California was assured by the three county clerks who were named as defendants that the three named plaintiffs would be allowed to register and vote. The three named plaintiffs resided respectively in the California counties of San Luis Obispo, Monterey, and Stanislaus, and the county clerks of those counties who were named as defendants neither defended the action in the Supreme Court of California nor sought review here. Petitioner here is the County Clerk of Mendocino County, who though of course bound by the judgment of the Supreme Court of California, since she was made a party to that action, has no concrete dispute with voters who reside in other counties. Thus if the case were limited to the named parties alone, it could be persuasively argued that there was no present dispute on the issue of the right to register between the three named individual respondents in this Court and the one named petitioner here.

We think, however, that the unusual procedural history of the case in the Supreme Court of California leads to the conclusion that the litigation before us is not moot. The individual named plaintiffs brought their action in the Supreme Court of California on behalf of themselves and all other ex-felons similarly situated, and not simply

those ex-felons residing in the counties in which the named plaintiffs resided. While only the county clerks of Stanislaus, Monterey, and San Luis Obispo were named parties defendant, they were designated in the original complaint filed in the Supreme Court of California "as representatives of the class of all other County Clerks." The California Secretary of State was likewise named a party defendant. On the basis of this complaint, the Supreme Court of California issued an alternative writ of mandate directed to the three named county clerks "individually and as representatives of the class of all other County Clerks and Registrars of Voters," directing them to register to vote not simply the three named plaintiffs, but "all ex-felons whose term of incarceration and parole have expired and who upon application demonstrate that they are otherwise fully qualified to vote," or in the alternative to show cause why they had not done so upon the return date of the writ. Thus, while the Supreme Court of California did not in so many words say that it was permitting respondents to proceed by way of a "class action," the fact that the court's process recited that the named clerks were subject to it "individually and as representatives of the class of all other County Clerks and Registrars of Voters," and the fact that the beneficiaries of that process were not merely the named plaintiffs but "all ex-felons whose term of incarceration and parole [had] expired . . ." indicates that the court treated the action as one brought for the benefit of the class described in the petition for the writ of mandate.

Petitioner Viola Richardson, the County Clerk of Mendocino County, filed a complaint in intervention in the action in the Supreme Court of California, alleging that the suit as framed by the named plaintiffs was collusive, in that neither the three named county clerks nor the Secretary of State could be expected to contest the claims

of plaintiffs. Petitioner Viola Richardson further alleged in her complaint of intervention that she was a party to a lawsuit brought against her by an ex-felon (also named Richardson) who had sought to register in Mendocino County, had been denied the right, and whose suit seeking to establish the right was then pending in the State Court of Appeal.

The county clerks actually named as defendants in the mandate action each obeyed the alternative writ issued by the Supreme Court of California, and did not contest the named plaintiffs' legal claim that they had a right to vote secured by the Equal Protection Clause of the Fourteenth Amendment which overrode the contrary provisions of the California Constitution. The Secretary of State appeared in the action and generally denied the named plaintiffs' essential claims.

The Supreme Court of California, prior to the return date of the writ, issued an order denying petitioner Richardson's motion to intervene, but instead ordered her added to the named defendants in the action along with the three other named county clerks and the Secretary of State. This action in the Supreme Court of California, coming as it did after the acquiescence of the named clerks in the counties in which the named plaintiffs resided, and yet at a time when the Secretary of State was still a party defendant who had answered the complaint, clearly indicates to us that that court considered the action to be not only on behalf of the three named plaintiffs, but also on behalf of all ex-felons in California similarly situated. We are reinforced in this conclusion by the language quoted above from the alternative writ of mandate issued by the Supreme Court of California. Had the Supreme Court of California based its action on petitioner Richardson's claim that the suit was collusive, and that it might become a binding precedent in

her litigation then pending in the State Court of Appeal, it would seem to have been sufficient to grant the motion to intervene. But the court's action adding petitioner Richardson as a named defendant would appear to have been based on its conclusion that at least some members of the class represented by the plaintiffs in fact resided in Mendocino County, and were there seeking to exercise their right to vote. In reaching such a conclusion, of course, the Supreme Court of California had before it petitioner Richardson's allegation that at least her opponent in the litigation pending in the Court of Appeal was not merely seeking to register to vote in Mendocino County, but had brought a lawsuit to enforce his claim.

At the time petitioner Richardson was added as a party defendant, the three named plaintiffs had obtained the relief which they sought, whereas the remaining members of the class, including petitioner Richardson's opponent in the Court of Appeal litigation, had not. We have held that in the federal system one may not represent a class of which he is not a part, *Bailey* v. *Patterson,* 369 U. S. 31, 32–33 (1962), and if this action had arisen in the federal courts there would be serious doubt as to whether it could have proceeded as a class action on behalf of the class of ex-felons denied the right to register after the three named plaintiffs had been granted that right. *Indiana Employment Security Div.* v. *Burney,* 409 U. S. 540 (1973). But California is at liberty to prescribe its own rules for class actions, subject only to whether limits may be imposed by the United States Constitution, and we interpret its action in adding petitioner Richardson as a defendant to mean that it regarded her opponent in the Court of Appeal litigation, both as an unnamed member of the class of ex-felons referred to in the mandate complaint, and as one of a class actually seeking to register in Mendocino County,

as a party to the action in the Supreme Court of California, albeit an unnamed one.

In *Brockington* v. *Rhodes,* 396 U. S. 41 (1969), we emphasized in finding the case moot that appellant's "suit did not purport to be a class action, and he sought no declaratory relief." *Id.,* at 42. We said:

> "[I]n view of the limited nature of the relief sought, we think the case is moot because the congressional election is over. The appellant did not allege that he intended to run for office in any future election. He did not attempt to maintain a class action on behalf of himself and other putative independent candidates, present or future. He did not sue for himself and others similarly situated as independent *voters,* as he might have under Ohio law. . . . He did not seek a declaratory judgment, although that avenue too was open to him. . . ." *Id.,* at 43.

Here, unlike *Brockington,* there was a class action, and relief in the nature of declaratory relief was granted. The decision below is not only binding on petitioner Richardson, and thus dispositive of her other Court of Appeal litigation, but also decides the federal constitutional question presented for the unnamed members of the classes represented below by petitioner and respondents, whose continuing controversy led the Supreme Court of California to conclude that this case was not moot.

The briefs of the parties before us indicate that the adverse alignment in the Supreme Court of California continues in this Court, and we therefore hold the case is not moot.[13]

---

[13] Our Brother MARSHALL argues in dissent that since the Supreme Court of California did not issue the peremptory writ of mandate, its opinion in this case is an advisory one which does not come within the "case or controversy" requirement of Art. III of the Constitution. He also contends that that court's refusal to issue the

## II

Unlike most claims under the Equal Protection Clause, for the decision of which we have only the language of the Clause itself as it is embodied in the Fourteenth

---

peremptory writ must rest on some unarticulated state ground, which he concludes should bar review of the federal constitutional question by this Court.

The Supreme Court of California has only recently noted its policy of avoiding advisory opinions on abstract questions of law, *In re William M.,* 3 Cal. 3d 16, 473 P. 2d 737 (1970), while in the same opinion adverting to its "declaratory use of habeas corpus in a number of cases" such as *In re Gonsalves,* 48 Cal. 2d 638, 311 P. 2d 483 (1957). In support of its determination in the case before us that exercise of its original jurisdiction would be appropriate, the Supreme Court of California cited *Young* v. *Gnoss,* 7 Cal. 3d 18, 496 P. 2d 445 (1972). There it had exercised its original mandamus jurisdiction to conclude that the durational residence requirements for voting imposed by California law violated the Equal Protection Clause of the Fourteenth Amendment. Saying that its "function at this time is simply to declare the minimum that must be done to implement *Dunn* v. *Blumstein*[, 405 U. S. 330 (1972)]," 7 Cal. 3d, at 27, 496 P. 2d, at 451, the court refused to issue a peremptory writ of mandate in that case, just as it did here, saying that "[s]ince there is no reason to believe that any of the parties to this proceeding will not accede to our holdings herein, no purpose would be served by issuing a writ of mandate to compel such compliance with respect to the November 1972 general election. . . ." *Id.,* at 29, 496 P. 2d, at 453. United States courts of appeals, which are barred by the case-or-controversy requirement of Art. III from issuing advisory opinions, have nonetheless declined to issue peremptory writs against district judges on the assumption that the latter would abide by the opinion of the court of appeals without the compulsion of such a writ. *In re United States,* 257 F. 2d 844 (CA5 1958); *In re United States,* 207 F. 2d 567 (CA5 1953).

We think that the reliance of the Supreme Court of California on its earlier decision recognizing and approving the use of its original jurisdiction to grant declaratory relief, as well as its reliance on precedent in an original mandamus proceeding in which it reached the merits but declined to issue the peremptory writ where there

Amendment, respondents' claim implicates not merely the language of the Equal Protection Clause of § 1 of the Fourteenth Amendment, but also the provisions of the less familiar § 2 of the Amendment:

"Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime,* the basis of representation therein shall be reduced in the proportion which the num-

---

was no question of mootness, supports our conclusion that that court's judgment in this case is for all practical purposes at least a declaratory judgment. And it is well settled that, where there is "an actual and acute controversy," an appeal from a declaratory judgment of a state court presents a "case or controversy" within this Court's jurisdiction. *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U. S. 249 (1933). Indeed, any other conclusion would unnecessarily permit a state court of last resort, quite contrary to the intention of Congress in enacting 28 U. S. C. § 1257, to invalidate state legislation on federal constitutional grounds without any possibility of state officials who were adversely affected by the decision seeking review in this Court.

We are equally unable to accept the view of the dissenters that the California court's failure here to issue the peremptory writ must rest on that court's resolution of some unspecified state law question against petitioner. The mere failure of a state court to award peremptory relief in a proceeding which it treats as one for a declaratory judgment is not an "adequate state ground" which precludes our review of its federal constitutional holding.

ber of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State." (Emphasis supplied.)

Petitioner contends that the italicized language of § 2 expressly exempts from the sanction of that section disenfranchisement grounded on prior conviction of a felony. She goes on to argue that those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in § 1 of that Amendment that which was expressly exempted from the lesser sanction of reduced representation imposed by § 2 of the Amendment. This argument seems to us a persuasive one unless it can be shown that the language of § 2, "except for participation in rebellion, or other crime," was intended to have a different meaning than would appear from its face.

The problem of interpreting the "intention" of a constitutional provision is, as countless cases of this Court recognize, a difficult one. Not only are there deliberations of congressional committees and floor debates in the House and Senate, but an amendment must thereafter be ratified by the necessary number of States. The legislative history bearing on the meaning of the relevant language of § 2 is scant indeed; the framers of the Amendment were primarily concerned with the effect of reduced representation upon the States, rather than with the two forms of disenfranchisement which were exempted from that consequence by the language with which we are concerned here. Nonetheless, what legislative history there is indicates that this language was intended by Congress to mean what it says.

A predecessor of § 2 was contained in an earlier draft of the proposed amendment, which passed the House of Representatives, but was defeated in the Senate early in 1866. The Joint Committee of Fifteen on Recon-

struction then reconvened, and for a short period in April 1866, revised and redrafted what ultimately became the Fourteenth Amendment. The Journal of that Committee's proceedings shows only what motions were made and how the various members of the Committee voted on the motions; it does not indicate the nature or content of any of the discussion in the Committee. While the Journal thus enables us to trace the evolution of the draft language in the Committee, it throws only indirect light on the intention or purpose of those who drafted § 2. See B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 104–120 (1914).

We do know that the particular language of § 2 upon which petitioner relies was first proposed by Senator Williams of Oregon to a meeting of the Joint Committee on April 28, 1866. Senator Williams moved to strike out what had been § 3 of the earlier version of the draft, and to insert in place thereof the following:

> "Representatives shall be apportioned among the several states which may be included within this Union according to their respective numbers, counting the whole number of persons in each State excluding Indians not taxed. But whenever in any State the elective franchise shall be denied to any portion of its male citizens, not less than twenty-one years of age, or in any way abridged, except for participation in rebellion or other crime, the basis of representation in such State shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens not less than twenty-one years of age." *Id.*, at 102.

The Joint Committee approved this proposal by a lopsided margin, and the draft Amendment was reported to the House floor with no change in the language of § 2.

Throughout the floor debates in both the House and the Senate, in which numerous changes of language in § 2 were proposed, the language "except for participation in rebellion, or other crime" was never altered. The language of § 2 attracted a good deal of interest during the debates, but most of the discussion was devoted to its foreseeable consequences in both the Northern and Southern States, and to arguments as to its necessity or wisdom. What little comment there was on the phrase in question here supports a plain reading of it.

Congressman Bingham of Ohio, who was one of the principal architects of the Fourteenth Amendment and an influential member of the Committee of Fifteen, commented with respect to § 2 as follows during the floor debates in the House:

"The second section of the amendment simply provides for the equalization of representation among all the States of the Union, North, South, East, and West. It makes no discrimination. New York has a colored population of fifty thousand. By this section, if that great State discriminates against her colored population as to the elective franchise, (except in cases of crime,) she loses to that extent her representative power in Congress. So also will it be with every other State." Cong. Globe, 39th Cong., 1st Sess., 2543 (1866).

Two other Representatives who spoke to the question made similar comments. Representative Eliot of Massachusetts commented in support of the enactment of § 2 as follows:

"Manifestly no State should have its basis of national representation enlarged by reason of a portion of citizens within its borders to which the elective franchise is denied. If political power shall be lost because of such denial, not imposed because of

participation in rebellion or other crime, it is to be hoped that political interests may work in the line of justice, and that the end will be the impartial enfranchisement of all citizens not disqualified by crime." *Id.*, at 2511.

Representative Eckley of Ohio made this observation:

"Under a congressional act persons convicted of a crime against the laws of the United States, the penalty for which is imprisonment in the penitentiary, are now and always have been disfranchised, and a pardon did not restore them unless the warrant of pardon so provided.

". . . But suppose the mass of the people of a State are pirates, counterfeiters, or other criminals, would gentlemen be willing to repeal the laws now in force in order to give them an opportunity to land their piratical crafts and come on shore to assist in the election of a President or members of Congress because they are numerous? And let it be borne in mind that these latter offenses are only crimes committed against property; that of treason is against the nation, against the whole people—the highest known to the law." *Id.*, at 2535.

The debates in the Senate did not cover the subject as exhaustively as did the debates in the House, apparently because many of the critical decisions were made by the Republican Senators in an unreported series of caucuses off the floor. Senator Saulsbury of Delaware, a Democrat who was not included in the majority caucus, observed:

"It is very well known that the majority of the members of this body who favor a proposition of this character have been in very serious delibera-

tion for several days in reference to these amendments, and have held some four or five caucuses on the subject." *Id.*, at 2869.

Nonetheless, the occasional comments of Senators on the language in question indicate an understanding similar to that of the House members. Senator Johnson of Maryland, one of the principal opponents of the Fourteenth Amendment, made this argument:

"Now it is proposed to deny the right to be represented of a part, simply because they are not permitted to exercise the right of voting. You do not put them upon the footing of aliens, upon the footing of rebels, upon the footing of minors, upon the footing of the females, upon the footing of those who may have committed crimes of the most heinous character. Murderers, robbers, houseburners, counterfeiters of the public securities of the United States, all who may have committed any crime, at any time, against the laws of the United States or the laws of a particular State, are to be included within the basis; but the poor black man, unless he is permitted to vote, is not to be represented, and is to have no interest in the Government." *Id.*, at 3029.

Senator Henderson of Missouri, speaking in favor of the version of § 2 which had been reported by the Joint Committee in April, as opposed to the earlier provision of the proposal which had been defeated in the Senate, said this:

"The States under the former proposition [the corresponding provision of the original Amendment reported by the Committee of Fifteen, which passed the House of Representatives but was defeated in the Senate] might have excluded the negroes under

48

an educational test and yet retained their power in Congress. Under this they cannot. For all practical purposes,. under the former proposition loss of representation followed the disfranchisement of the negro only; under this it follows the disfranchisement of white and black, unless excluded on account of 'rebellion or other crime.' " *Id.*, at 3033.

Further light is shed on the understanding of those who framed and ratified the Fourteenth Amendment, and thus on the meaning of § 2, by the fact that at the time of the adoption of the Amendment, 29 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes.[14]

More impressive than the mere existence of the state constitutional provisions disenfranchising felons at the time of the adoption of the Fourteenth Amendment is the congressional treatment of States readmitted to the Union following the Civil War. For every State thus readmitted, affirmative congressional action in the form of an enabling act was taken, and as a part of the

---

[14] Ala. Const., Art. 6, § 5 (1819); Cal. Const., Art. 2, § 5 (1849); Conn. Const., Art. 6, § 3 (1818); Del. Const., Art. 4, § 1 (1831); Fla. Const., Art. 6, § 4 (1838); Ga. Const., Art. 2, § 6 (1868); Ill. Const., Art. 2, § 30 (1818); Ind. Const., Art. 6, § 4 (1816); Iowa Const., Art. 2, § 5 (1846); Kan. Const., Art. 5, § 2 (1859); Ky. Const., Art. 6, § 4 (1799); La. Const., Art. 6, § 4 (1812); Md. Const., Art. 1, § 5 (1851); Minn. Const., Art. 7, § 2 (1857); Miss. Const., Art. 6, § 5 (1817); Mo. Const., Art. 3, § 14 (1820); Nev. Const., Art. 2, § 1 (1864); N. J. Const., Art. 2, § 1 (1844); N. Y. Const., Art. 2, § 2 (1821); N. C. Const., Art. 6, § 5 (1868); Ohio Const., Art. 4, § 4 (1802); Ore. Const., Art. 2, § 3 (1857); R. I. Const., Art. 2, § 4 (1842); S. C. Const., Art. 4 (1865); Tenn. Const., Art. 4, § 2 (1834); Tex. Const., Art. 7, § 4 (1845); Va. Const., Art. 3, § 14 (1830); W. Va. Const., Art. 3, § 1 (1863); Wis. Const., Art. 3, § 2 (1848).

readmission process the State seeking readmission was required to submit for the approval of the Congress its proposed state constitution. In March 1867, before any State was readmitted, Congress passed "An act to provide for the more efficient Government of the Rebel States," the so-called Reconstruction Act. Act of Mar. 2, 1867, c. 153, 14 Stat. 428. Section 5 of the Reconstruction Act established conditions on which the former Confederate States would be readmitted to representation in Congress. It provided:

"That when the people of any one of said rebel States shall have formed a constitution of government in conformity with the Constitution of the United States in all respects, framed by a convention of delegates elected by the male citizens of said State, twenty-one years old and upward, of whatever race, color, or previous condition, who have been resident in said State for one year previous to the day of such election, *except such as may be disfranchised for participation in the rebellion or for felony at common law,* and when such constitution shall provide that the elective franchise shall be enjoyed by all such persons as have the qualifications herein stated for electors of delegates, and when such constitution shall be ratified by a majority of the persons voting on the question of ratification who are qualified as electors for delegates, and when such constitution shall have been submitted to Congress for examination and approval, and Congress shall have approved the same, and when said State, by a vote of its legislature elected under said constitution, shall have adopted the amendment to the Constitution of the United States, proposed by the Thirty-ninth Congress, and known as article fourteen, and when said article shall have become a part of the Constitution

of the United States, said State shall be declared entitled to representation in Congress, and senators and representatives shall be admitted therefrom on their taking the oath prescribed by law, and then and thereafter the preceding sections of this act shall be inoperative in said State . . . ." (Emphasis supplied.)

Section 5 was introduced as a Senate amendment to the House bill, which was concerned only with the establishment of military government in the former Confederate States. Cong. Globe, 39th Cong., 2d Sess., 1360–1361 (1867). The legislative history of the Reconstruction Act was recounted by Senator Henderson of Missouri, who ultimately voted for it:

"As the bill originally came from the House it was a bald and naked proposition to establish without limitation of power or the time of its duration a purely military government for the ten States now unrepresented. This, in my judgment, was a most dangerous experiment. . . .

"The Senate, being unwilling to embark on the experiment of pure military rule, modified the House bill by adopting what is known as the Blaine or Sherman amendment. This amendment conceded military rule, as asked by the House, but put some sort of limit to its duration. It provided that when the rebel States should adopt universal suffrage, regardless of color or race, excluding none, white or black, except for treason or such crimes as were felony at the common law, the regulation of exclusion to be left to the States themselves, and should adopt the constitutional amendment proposed at the last session of Congress . . . and so soon as a sufficient number of said States should adopt it to make it a

part of the Constitution of the United States, then military law should cease and the States should be admitted, provided that Congress even then should see fit to receive them." *Id.*, at 1641.

A series of enabling acts in 1868 and 1870 admitted those States to representation in Congress. The Act admitting Arkansas, the first State to be so admitted, attached a condition to its admission. Act of June 22, 1868, c. 69, 15 Stat. 72. That Act provided:

"WHEREAS the people of Arkansas, in pursuance of the provisions of an act entitled 'An act for the more efficient government of the rebel States,' passed March second, eighteen hundred and sixty-seven, and the act supplementary thereto, have framed and adopted a constitution of State government, which is republican, and the legislature of said State has duly ratified the amendment to the Constitution of the United States proposed by the Thirty-ninth Congress, and known as article fourteen: Therefore,

"*Be it enacted* . . . That the State of Arkansas is entitled and admitted to representation in Congress as one of the States of the Union upon the following fundamental condition: That the constitution of Arkansas shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the constitution herein recognized, except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted, under laws equally applicable to all the inhabitants of said State: *Provided,* That any alteration of said constitution prospective in its effect may be made in regard to the time and place of residence of voters."

The phrase "under laws equally applicable to all the inhabitants of said State" was introduced as an amendment to the House bill by Senator Drake of Missouri. Cong. Globe, 40th Cong., 2d Sess., 2600 (1868). Senator Drake's explanation of his reason for introducing his amendment is illuminating. He expressed concern that without that restriction, Arkansas might misuse the exception for felons to disenfranchise Negroes:

> "There is still another objection to the condition as expressed in the bill, and that is in the exception as to the punishment for crime. The bill authorizes men to be deprived of the right to vote 'as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted.' There is one fundamental defect in that, and that is that there is no requirement that the laws under which men shall be duly convicted of these crimes shall be equally applicable to all the inhabitants of the State. It is a very easy thing in a State to make one set of laws applicable to white men, and another set of laws applicable to colored men." *Ibid.*

The same "fundamental condition" as was imposed by the act readmitting Arkansas was also, with only slight variations in language, imposed by the Act readmitting North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida, enacted three days later. Act of June 25, 1868, c. 70, 15 Stat. 73. That condition was again imposed by the Acts readmitting Virginia, Mississippi, Texas, and Georgia early in 1870. Act of Jan. 26, 1870, c. 10, 16 Stat. 62; Act of Feb. 1, 1870, c. 12, 16 Stat. 63; Act of Feb. 23, 1870, c. 19, 16 Stat. 67; Act of Mar. 30, 1870, c. 39, 16 Stat. 80; Act of July 15, 1870, c. 299, 16 Stat. 363.

This convincing evidence of the historical understanding of the Fourteenth Amendment is confirmed by the decisions of this Court which have discussed the constitutionality of provisions disenfranchising felons. Although the Court has never given plenary consideration to the precise question of whether a State may constitutionally exclude some or all convicted felons from the franchise, we have indicated approval of such exclusions on a number of occasions. In two cases decided toward the end of the last century, the Court approved exclusions of bigamists and polygamists from the franchise under territorial laws of Utah and Idaho. *Murphy* v. *Ramsey*, 114 U. S. 15 (1885); *Davis* v. *Beason*, 133 U. S. 333 (1890). Much more recently we have strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision. In *Lassiter* v. *Northampton County Board of Elections*, 360 U. S. 45 (1959), where we upheld North Carolina's imposition of a literacy requirement for voting, the Court said, *id.*, at 51:

> "Residence requirements, age, previous criminal record (*Davis* v. *Beason*, 133 U. S. 333, 345–347) are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters."

Still more recently, we have summarily affirmed two decisions of three-judge District Courts rejecting constitutional challenges to state laws disenfranchising convicted felons. *Fincher* v. *Scott*, 352 F. Supp. 117 (MDNC 1972), aff'd, 411 U. S. 961 (1973); *Beacham* v. *Braterman*, 300 F. Supp. 182 (SD Fla.), aff'd, 396 U. S. 12 (1969). Both District Courts relied on *Green* v. *Board of Elections*, 380 F. 2d 445 (1967), cert. denied, 389 U. S. 1048 (1968), where the Court of Appeals for the

Second Circuit held that a challenge to New York's exclusion of convicted felons from the vote did not require the convening of a three-judge district court.

Despite this settled historical and judicial understanding of the Fourteenth Amendment's effect on state laws disenfranchising convicted felons, respondents argue that our recent decisions invalidating other state-imposed restrictions on the franchise as violative of the Equal Protection Clause require us to invalidate the disenfranchisement of felons as well. They rely on such cases as *Dunn* v. *Blumstein,* 405 U. S. 330 (1972), *Bullock* v. *Carter,* 405 U. S. 134 (1972), *Kramer* v. *Union Free School District,* 395 U. S. 621 (1969), and *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), to support the conclusions of the Supreme Court of California that a State must show a "compelling state interest" to justify exclusion of ex-felons from the franchise and that California has not done so here.

As we have seen, however, the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated in the cases on which respondents rely. We hold that the understanding of those who adopted the Fourteenth Amendment, as reflected in the express language of § 2 and in the historical and judicial interpretation of the Amendment's applicability to state laws disenfranchising felons, is of controlling significance in distinguishing such laws from those other state limitations on the franchise which have been held invalid under the Equal Protection Clause by this Court. We do not think that the Court's refusal to accept Mr. Justice Harlan's position in his dissents in *Reynolds* v. *Sims,* 377 U. S. 533, 589 (1964), and *Carrington* v. *Rash,* 380 U. S. 89, 97 (1965), that § 2 is the only part of the Amend-

ment dealing with voting rights, dictates an opposite result. We need not go nearly so far as Mr. Justice Harlan would to reach our conclusion, for we may rest on the demonstrably sound proposition that § 1, in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which § 2 imposed for other forms of disenfranchisement. Nor can we accept respondents' argument that because § 2 was made part of the Amendment " 'largely through the accident of political exigency rather than through the relation which it bore to the other sections of the Amendment,' " we must not look to it for guidance in interpreting § 1. It is as much a part of the Amendment as any of the other sections, and how it became a part of the Amendment is less important than what it says and what it means.

Pressed upon us by the respondents, and by *amici curiae,* are contentions that these notions are outmoded, and that the more modern view is that it is essential to the process of rehabilitating the ex-felon that he be returned to his role in society as a fully participating citizen when he has completed the serving of his term. We would by no means discount these arguments if addressed to the legislative forum which may properly weigh and balance them against those advanced in support of California's present constitutional provisions. But it is not for us to choose one set of values over the other. If respondents are correct, and the view which they advocate is indeed the more enlightened and sensible one, presumably the people of the State of California will ultimately come around to that view. And if they do not do so, their failure is some evidence, at least, of the fact that there are two sides to the argument.

We therefore hold that the Supreme Court of California erred in concluding that California may no longer, consistent with the Equal Protection Clause of the Fourteenth Amendment, exclude from the franchise convicted felons who have completed their sentences and paroles. The California court did not reach respondents' alternative contention that there was such a total lack of uniformity in county election officials' enforcement of the challenged state laws as to work a separate denial of equal protection, and we believe that it should have an opportunity to consider the claim before we address ourselves to it. Accordingly, we reverse and remand for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Court today holds that a State may strip ex-felons who have fully paid their debt to society of their fundamental right to vote without running afoul of the Fourteenth Amendment. This result is, in my view, based on an unsound historical analysis which already has been rejected by this Court. In straining to reach that result, I believe that the Court has also disregarded important limitations on its jurisdiction. For these reasons, I respectfully dissent.

## I

A brief retracing of the procedural history of this case is necessary to a full understanding of my views. Each of the respondents, the plaintiffs below,[1] had been con-

---

[1] The proceeding below was a petition for a writ of mandate in the California Supreme Court, hence the moving parties should properly be described as petitioners rather than plaintiffs. However, to avoid confusion, since the petitioners below are the re-

victed of a felony unrelated to voting and had fully served his term of incarceration and parole. Each applied to register to vote in his respective county—Ramirez in San Luis Obispo County, Lee in Monterey County, and Gill in Stanislaus County. All three were refused registration because, under applicable provisions of the California Constitution, "no person convicted of any infamous crime . . . shall ever exercise the privileges of an elector." [2]

The three named plaintiffs filed a petition for a writ of mandate in the California Supreme Court, invoking its original jurisdiction. Plaintiffs challenged the State's disenfranchisement of ex-felons as being violative of the Equal Protection Clause of the Fourteenth Amendment and sought issuance of a peremptory writ of mandate to compel their registration. The complaint labeled the suit as brought "individually and on behalf of all other persons who are ineligible to register to vote in California solely by reason of a conviction of a felony other than an election code felony" and who had fully served their terms of incarceration and parole. The complaint named, as defendants, the election officials who had refused to register them, "individually and as representatives of the class of all other County Clerks and Registrars of Voters who have the duty of determining for their respective counties whether any ex-felon will be denied the right to vote."

---

spondents here and vice versa, the parties in the California court will be referred to herein simply as plaintiffs and defendants.

[2] California Const., Art. II, § 1, provided, in part, that "no person convicted of any infamous crime . . . shall ever exercise the privileges of an elector in this State." Article II, § 1, was repealed by referendum at the November 7, 1972, general election and was replaced by a new Art. II, § 3, containing the same prohibition. The state implementing statutes include California Elections Code §§ 310, 321, 383, 389, 390, and 14240.

The three named election officials did not contest the action and represented to the state court that they would permit the named plaintiffs and all similarly situated ex-felons in their counties to register and to vote. The representative of the Secretary of State of California, also named as a defendant, has similarly agreed not to contest the suit.[3] At this point in the litigation all of the named plaintiffs had been voluntarily afforded the relief they were seeking by the election officials in their respective counties.

Subsequently, the petitioner in this Court, Viola Richardson, as County Clerk of Mendocino County, filed a motion to intervene in the proceedings before the California Supreme Court. She indicated to the court that she was being sued in a separate action in a lower state court by an ex-felon seeking to register in her county and that the decision in this case would be dispositive of the legal issue in that controversy. The State Supreme Court ordered Richardson added as a named defendant in the instant action, but did not name the ex-felon suing her as a plaintiff or named class representative herein.

In its opinion, the California Supreme Court found the case not to be moot and took the opportunity to address the merits of the Fourteenth Amendment issue. It indicated that, in its view, the ex-felon disenfranchisement provision of the California Constitution and its implementing statutes violated the Equal Protection Clause. The state court did not, however, afford the plaintiffs the relief they sought. The court denied the peremptory writ of mandate.

Although the California Supreme Court did not issue a writ ordering Richardson to register either the ex-felon

---

[3] The Attorney General filed a separate petition for certiorari, No. 73–324, to review the judgment of the California Supreme Court. The Secretary of State filed a memorandum opposing that petition for certiorari. The petition was denied today, *post,* p. 904.

suing her or any other potential elector in her county, she sought review of the state court's decision by way of writ of certiorari in this Court. The election officials in the named plaintiffs' counties did not seek review and the Secretary of State filed a memorandum opposing review by this Court.

A

There are a number of reasons why I do not believe this case is properly before us at this time. First, I am persuaded that the judgment of the California Supreme Court rests on an adequate and independent state ground.

> "This Court from the time of its foundation has adhered to the principle that it will not review judgments of state courts that rest on adequate and independent state grounds. . . . Our only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights. And our power is to correct wrong judgments, not to revise opinions. We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion." *Herb* v. *Pitcairn*, 324 U. S. 117, 125–126 (1945).

Plaintiffs sought, from the California Supreme Court, a writ of mandate compelling their registration. The state court denied that relief. The entirety of the judgment of that court is as follows:

> "The alternative writ, having served its purpose, is discharged, and the petition for peremptory writ is denied." *Ramirez* v. *Brown*, 9 Cal. 3d 199, 217, 507 P. 2d 1345, 1357 (1973).[4]

---

[4] The judgment of the California Supreme Court is by custom the final paragraph of its opinion. The alternative writ referred to is merely a show-cause order, requiring the respondent to com-

The accompanying opinion indicates that the California court did not consider the case before it to be moot and that, in its view, the plaintiffs' assertion that the disenfranchisement provisions were unconstitutional was well taken. Since the court nonetheless denied plaintiffs the relief they sought, we can only conclude that it did so on independent state law grounds. Cf. *Brockington* v. *Rhodes*, 396 U. S. 41, 44 (1969). For example, a writ of mandate being discretionary, the state court may have declined its issuance simply because the named plaintiffs had already been registered and mandate relief seemed unnecessary.[5] There is certainly no indication that the decision to deny the writ was based on the state court's view on any federal question.

This Court creates an interesting anomaly by purporting to reverse the judgment of the California court. Since that court denied a writ of mandate to compel the registration of ex-felons, the only disposition consistent with this Court's view that the California disenfranchisement provisions are constitutional would be to affirm the judgment below. By reversing, the Court apparently directs the issuance of the peremptory writ. This anomaly demonstrates that this is a classic example of a case where "the same judgment would be rendered by the state court after we corrected its views of federal laws," *Herb* v. *Pitcairn, supra,* at 126; hence we can but offer an advisory opinion here. Whether we agree or disagree with the state court's view of the constitutionality of the challenged provisions, the judgment of the state court will necessarily remain to deny the writ of mandate.

The Court is aware of this problem and purports to resolve it by speculating that the California court may

---

ply with the petitioner's demand or show cause why it should not be ordered to do so.

[5] See 5 B. Witkin, Cal. Proc. 2d, Extraordinary Writs § 22, pp. 3796–3797, and § 123, p. 3899 (1971).

have afforded plaintiffs declaratory relief. Such speculation is totally unfounded. Neither the opinion nor the judgment of the court below even mentions declaratory relief. The plaintiffs did not seek a declaratory judgment. The California Constitution on its face appears to bar the State Supreme Court from issuing a declaratory judgment in an original proceeding such as the one before us, since it limits that court's original jurisdiction to "proceedings for extraordinary relief in the nature of mandamus, certiorari, and prohibition." Calif. Const., Art. 6, § 10 (Supp. 1974). Exclusive jurisdiction for suits seeking declaratory relief is vested, by statute, in the State Superior Courts.[6]

This Court's basis for construing the judgment of the court below as affording declaratory relief is its argument that because the California Supreme Court is the highest court of the State, its observations on the constitutionality of the challenged disenfranchisement provisions are apt to be heeded by state officials. It is true that the opinion of the California court did indicate a view on the merits of the plaintiffs' constitutional claim. But this Court's power "is to correct wrong judgments, not to revise opinions." *Herb* v. *Pitcairn, supra,* at 126. One could always argue that where a state court had commented on a matter of federal law, state officials would heed those comments. To say that such comments are a "declaration of federal law" reviewable by this Court is a rationale that would reach every case in which the state court decision rests on adequate

---

[6] Calif. Code Civ. Proc. § 1060; see 15 Cal. Jur. 2d, Declaratory Relief § 13; 3 B. Witkin, Cal. Proc. 2d, Pleading § 705 (c), p. 2329 (1971); see, *e. g., Dills* v. *Delira Corp.,* 145 Cal. App. 2d 124, 129, 302 P. 2d 397, 400 (1956).

The difference between "mandamus and declaratory relief [is] that appellate courts cannot give the latter." 5 B. Witkin, Cal. Proc. 2d, Extraordinary Writs § 21, p. 3796 (1971).

state grounds, rendering that doctrine a virtual nullity. The Court also cites two cases for the proposition that the California Supreme Court can issue a declaratory judgment in an original proceeding. But, on closer inspection, the cases cited by the Court, *ante,* at 41 n. 13, merely demonstrate that California courts, whose jurisdiction is not limited by any equivalent to Art. III, are free to render advisory opinions.[7] There is little doubt

---

[7] In the first case relied on by the majority, *In re William M.,* 3 Cal. 3d 16, 473 P. 2d 737 (1970), the California Supreme Court had previously granted a writ of habeas corpus which effectively mooted the petitioner's claim for relief. The court, nonetheless, later issued an opinion on the issue posed by the case while denying further relief. In a footnote, the court observed that as a general proposition, courts should avoid advisory opinions, but, in the very next sentence, reaffirmed its inherent discretion to issue such opinions. In the accompanying text, the court noted that it could render a decision in a moot case which would not be binding on a party before it, where the case involved issues of particular public importance. Although the court referred to its "declaratory use of habeas corpus in a number of cases," citing B. Witkin, Cal. Crim. Proc. § 790 (1963), and *In re Fluery,* 67 Cal. 2d 600, 432 P. 2d 986 (1967), the Witkin treatise refers to the court's "declaratory use of habeas corpus" and *In re Fluery, supra,* in particular, as examples of the "use of the writ to render a purely advisory opinion unnecessary to the determination of the particular controversy." B. Witkin, Cal. Crim. Proc., Habeas Corpus and Other Extraordinary Writs § 790, p. 247 (Supp. 1967).

The second case relied on by the majority is *Young* v. *Gnoss,* 7 Cal. 3d 18, 496 P. 2d 445 (1972), cited by the court below solely for the proposition that mandamus is an appropriate remedy to seek in an original proceeding. In that case, the petitioners had sought mandamus relief from the application of a state durational residence requirement for voting in order that they might vote in a June primary. The California Supreme Court, in a lengthy opinion, indicated that the challenged requirement was unconstitutional on the authority of our decision in *Dunn* v. *Blumstein,* 405 U. S. 330 (1972), but exercised its equitable discretion not to order a change in the residence requirements for the June primary

that many public officials would heed such an advisory opinion from the California Supreme Court and they would also heed an advisory opinion issued by this Court, but that does not free us from the constitutional limitations on our jurisdiction.

Because I believe that the judgment of the California court was based on adequate and independent state grounds, I do not think we have jurisdiction to consider any other issues presented by this case.

## B

Assuming, *arguendo,* that the California Supreme Court did grant a declaratory judgment, I still believe that we are without jurisdiction because no case or controversy is presented. The Court seems willing to concede that the claims of the named plaintiffs may well be moot. *Ante,* at 36. The Court, however, premises its

---

because too little time remained for such a change to be implemented in an orderly fashion. Accordingly, mandamus relief was denied. The court recommended that the necessary changes in residence requirements be effected before the November election but did not so order to give the "Legislature the opportunity to address itself to the problem . . . ." 7 Cal. 3d, at 28, 496 P. 2d, at 452–453. The court relied on its earlier decision in *Legislature* v. *Reinecke,* 6 Cal. 3d 595, 492 P. 2d 385 (1972), where the court had expressed its views on a legislative reapportionment problem, denied a writ of mandate, and retained jurisdiction to allow the legislature an opportunity to act before providing any judicial relief.

Each of these cases involves examples of advisory opinions rather than declaratory relief. In the latter, what the California Supreme Court did was to provide some guidance to the legislature while staying its hand and not affording judicial relief for the claimed deprivation. It seems well settled that California courts have "inherent discretion" to issue such advisory opinions. See 2 B. Witkin, Cal. Proc. 2d, Actions § 44, p. 920 (1970); *id.,* § 42, p. 916; 5 B. Witkin, Cal. Proc. 2d, Extraordinary Writs § 117, p. 3894; cf. *Kirstowsky* v. *Superior Court,* 143 Cal. App. 2d 745, 749, 300 P. 2d 163, 166 (1956).

jurisdiction on the assumption that there is a live contro-
versy between the named petitioner in this Court and the
unnamed plaintiff class members in her own county. To
reach this conclusion, it is essential for the Court to con-
clude that this case is, in fact, a class action and that, in
the circumstances of this case, it is appropriate to look to
unnamed class members to determine whether there is a
live controversy.

I am forced to point out that one of the crucial premises
upon which the Court bases its assumption of jurisdic-
tion—the existence of a class action—is highly specula-
tive. I am persuaded that the California court never
treated this case as a class action. As the majority notes,
the case was titled a class action by its originators and
the show-cause order merely tracked the language of the
complaint. But the California court was, of course, not
bound by that designation. In the entirety of its lengthy
opinion, the California court does not once refer to this
suit as a class action, to respondents as class representa-
tives, to the existence of unnamed parties or to any other
indicia of class-action status. Rather, the state court
describes the case as simply "a proceeding for writ of
mandate brought by three ex-felons to compel respondent
election officials to register them as voters." 9 Cal. 3d,
at 201, 507 P. 2d, at 1346. The opinion proceeds to list
the three plaintiffs and, in a footnote, to explain that
the only other plaintiffs were the League of Women
Voters and three nonprofit organizations which support
the interests of ex-felons. The opinion describes the
defendants as the election officials of San Luis Obispo,
Monterey, and Stanislaus Counties and the Secretary of
State "in his capacity [as] chief elections officer of Cali-
fornia," and notes that "[u]pon application we ordered
the Mendocino County clerk [the petitioner here] joined
as an additional party [defendant]." *Id.*, at 202 n. 1,
507 P. 2d, at 1346 n. 1. This description of the parties

plainly indicates that this suit was not treated as a class action by the state court. I think it highly inappropriate that on the basis of nothing but speculation, this case be fashioned into a class action, for the first time, in this Court.

## C

Even assuming that this case is a class action, I still would not agree that it is properly before us. I do not believe that we can look beyond the named class members to find a case or controversy in the circumstances of this case. The Court seems to hold that review is not foreclosed by the possible mootness of the named plaintiffs' claim because, but for the California Supreme Court's decision, unnamed class members would still be subject to the challenged disenfranchisement, hence the case presents, as to unnamed class members, an issue capable of repetition, yet evading review. I disagree.

As the Court properly notes, a general rule of justiciability is that one may not represent a class of which he is not a part. Thus, as a general proposition, a federal court will not look to unnamed class members to establish the case-or-controversy requirement of Art. III.[8] But, the "evading review" doctrine of *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498, 515 (1911), as recently applied in *Dunn* v. *Blumstein,* 405 U. S. 330, 333 n. 2 (1972), provides a limited exception to the general rule— an exception necessary to insure that judicial review is not foreclosed in cases where intervening events threaten invariably to moot the named plaintiff's claim for relief.

---

[8] The Court has held, for example, that Art. III restricts standing to bring a class action to the actual members of the class. *O'Shea* v. *Littleton,* 414 U. S. 488 (1974). The named plaintiffs here had been disenfranchised at the time they filed suit, and there is thus no question concerning their standing to challenge the California disenfranchisement provisions.

The necessity for looking beyond the named class members in this limited category of cases is evidenced by our decision in *Dunn* v. *Blumstein, supra,* in which the Court struck down a durational residence requirement for voting. The suit had been brought to compel the registration of the named plaintiff and the members of the class he represented in order that they might participate in an election scheduled for August 6, 1970. The Federal District Court did not order preliminary relief in time for the August election and, by the time the District Court decided the case, the next election was scheduled for November 1970. By then, the named plaintiff would have met the challenged three-month requirement. The District Court, nonetheless, rejected the State's argument that the controversy over the validity of the three-month requirement was therefore moot.

By the time the appeal reached this Court, the only named plaintiff had also satisfied the one-year state residence requirement. We nonetheless reached the merits, observing that "[a]lthough appellee [the only named plaintiff] now can vote, the problem to voters posed by the Tennessee residence requirements is ' "capable of repetition, yet evading review." ' *Moore* v. *Ogilvie,* 394 U. S. 814, 816 (1969)." 405 U. S., at 333 n. 2. Both this Court and the District Court found that, although the named plaintiff had satisfied the challenged residence requirements and would no longer be disenfranchised thereby, the case was not moot. The challenged requirement remained applicable to unnamed class members,[9] and the

---

[9] The Court distinguished its decision in *Hall* v. *Beals,* 396 U. S. 45 (1969), finding a challenge to Colorado's durational residence requirement moot, on the grounds that, in *Hall,* there had been an intervening change in law reducing the residence requirements from six months to two while the case was on appeal. Accordingly, application of the six-month requirement was incapable of repetition as to the named plaintiff or any other member of his class, and, having

issue presented was likely to evade review. Obviously the mere passage of a few months would invariably have rendered a challenge to the residence requirements by individual named plaintiffs moot—threatening virtually to foreclose judicial review.

A similar situation was presented in *Roe* v. *Wade*, 410 U. S. 113 (1973), relied on by the California court. We there held that although a woman who was not pregnant at the time the suit was filed did not have standing to challenge the constitutionality of the Texas abortion laws, a continuing controversy over the constitutionality of those laws existed as to a named plaintiff who was pregnant when the suit was filed, even though she may not have been pregnant at later stages of the appeal. We concluded that this case provided a classic example of an issue capable of repetition, yet evading review, hence the termination of the plaintiff's pregnancy while the case was on appeal did not render the case moot—even though a woman whose pregnancy has ended is no more affected by the abortion laws than one who was not pregnant at the time the suit was filed. "[T]he . . . human gestation period is so short that . . . pregnancy will come to term before the usual appellate process is complete. If that termination makes a case moot, . . . appellate review will be effectively denied." *Id.*, at 125.

There are two common threads running through these cases—in each the challenged statute would continue to be applied, but the named plaintiff's claim would inevitably mature into mootness pending resolution of the lawsuit. In *Roe*, the termination of pregnancy, in *Dunn*, the passage of the residence requirement period, and in other voting cases, the occurrence of an election,[10] deprived

---

never been disenfranchised thereby, the named plaintiff had no standing to challenge the two-month requirement.

[10] The Court has found a live controversy in other voting cases in which intervening circumstances seemed to have mooted the named

the named plaintiff of a continuing controversy over the application of the challenged statute. In each instance, the mere passage of time threatened to insulate a constitutional deprivation from judicial review, and it is that danger which served as the rationale for rejecting suggestions of mootness. Where an invalid statute would thus continue to be applied simply because judicial review of a live controversy involving the named plaintiff was invariably foreclosed—the issue would be capable of repetition yet evading review.

Accordingly, the *Southern Pacific* doctrine requires the satisfaction of two tests in order to provide an answer to a suggestion of mootness. First, the claimed deprivation must, in fact, be "capable of repetition." This element is satisfied where, even though the named plaintiff's immediate controversy has been mooted by intervening events, either he or unnamed class members may continue to suffer the alleged constitutional deprivation in the future. The case before us clearly satisfies this first element of the *Southern Pacific* doctrine test. Since the California court declined to order any county clerk to

---

plaintiff's claim for relief. *Moore* v. *Ogilvie*, 394 U. S. 814 (1969), for example, was an appeal from a decision denying relief to appellants who had unsuccessfully sought to be certified, as required by state law, as independent candidates for Presidential elector on the 1968 ballot. Appellants asserted that the Illinois certification requirement violated the State's constitutional obligation not to discriminate against voters in less populous counties. By the time their appeal reached this Court, the 1968 election had already taken place, but we held the case was not moot because "while the 1968 election is over, [the challenged burden] remains and controls future elections . . . ," *id.*, at 816; see *Hall* v. *Beals, supra,* at 49, and the short span of time between the denial of certification for candidacy and actual balloting threatens to moot all future attacks on the questioned candidacy requirements. 394 U. S., at 816. See also *Storer* v. *Brown*, 415 U. S. 724, 737 n. 8 (1974); *Rosario* v. *Rockefeller*, 410 U. S. 752, 756 n. 5 (1973).

register ex-felons, presumably the challenged disenfranchisement provisions could continue to be applied to unnamed class members in counties other than those in which the named plaintiffs reside.[11]

Second, the issue presented must be likely to evade review, but for invocation of the *Southern Pacific* doctrine. It is on the "evading review" element that the Court's analysis fails. Because the claim raised in this case concerns not a time-related but rather a status-based deprivation, there is no issue evading review and no reason to look beyond the named plaintiffs.[12] This is

---

[11] The extent of continuing disenfranchisement is apt to be minimal. A survey conducted by the Secretary of State of California indicated that the election officials of 52 of the 58 counties in California, representing counties which contain 97.39% of the registered voters in the State, agreed with the clerks in the named plaintiffs' counties that ex-felons should not be barred from voting in their counties. Brief for Respondents 30.

[12] The Court's opinion cites our decision in *Indiana Employment Security Div.* v. *Burney*, 409 U. S. 540 (1973), for the proposition that unnamed class members may not be looked to in cases arising from the federal system, but the case does not support that proposition. *Burney* concerned a constitutional challenge to the termination of unemployment insurance benefits without a prior hearing. The only named class representative received a post-termination hearing at which she obtained a reversal of the initial determination of ineligiblity and full retroactive benefits. The Court remanded for consideration of mootness. The jurisdictional issue in this Court revolved around whether the case presented issues "capable of repetition, yet evading review." The Court did not have to find the alleged constitutional deprivation incapable of repetition, hence was not concerned with the problem of whether a future application to the named class representative was required. Rather, it appeared that the prior-hearing issue was not one which would evade review. But see *id.*, at 542–546 (dissenting opinion). The Court reasoned that a post-termination hearing, afforded as a matter of course, would not invariably moot all claims for relief from members of the class. If the post-termination hearing did not result in an award of retroactive payments, as it had in the named plain-

not a situation where, by the time a case reaches this Court, it will always be too late to grant the named plaintiff relief. If and when an ex-felon is refused access to the voting rolls because of his past criminal record, an intervening election will not moot his claim for relief and the status giving rise to his disenfranchisement will not inevitably terminate pending review.

There are clearly ways in which a challenge to the California disenfranchisement provisions could reach this Court. The California Supreme Court has not issued a writ of mandate compelling the registration of any ex-felon.[13] If such a potential voter is, in fact, refused registration, a controversy suitable for resolution by this Court will be presented. The suit brought against petitioner Richardson, by an ex-felon resident of her own county, raising the same issues as those presented by this case, is presently pending in a California intermediate appellate court.[14] In that case, petitioner Richardson did, in fact, deny the plaintiff registration because he was an ex-felon. Once that case completes its passage through the state courts, it could well serve as a vehicle for our review of the California disenfranchisement provisions.

---

tiff's case, a live and continuing controversy would be presented as to the insured's claim to the benefits allegedly wrongfully withheld pending the hearing. A case had already come to this Court in just such a posture, and the Court had summarily affirmed the judgment of the three-judge court. *Torres* v. *New York State Department of Labor,* 405 U. S. 949 (1972), but see 410 U. S. 971 (1973) (dissenting opinion to denial of rehearing). It was a failure to satisfy the "evading review" element of the test that led the Court to remand *Burney* for consideration of mootness.

[13] In the absence of such an order, petitioner Richardson is under no compulsion to register ex-felons in her county nor subject to any penalty for failing to do so. See Cal. Code Civ. Proc. § 1097 (1955).

[14] The suit against petitioner, *Richardson* v. *James,* 1 Civ. 32283, is presently pending in Division 3 of the Court of Appeal for the First Appellate District of California.

That is, of course, but one example of how the issue presented here could properly reach this Court. This case does not therefore benefit from the *Southern Pacific* doctrine's authority to look to unnamed class members to establish a case or controversy.

That the California Supreme Court appears to have found the plaintiffs' claims not to be moot does not detract from this conclusion since "[e]ven in cases arising in the state courts, the question of mootness is a federal one which a federal court must resolve before it assumes jurisdiction." *North Carolina* v. *Rice*, 404 U. S. 244, 246 (1971). Thus, unlike the Court, I am persuaded that we can look only to the named plaintiffs to satisfy the case-or-controversy requirement of Art. III.

### D

The named plaintiffs here were registered only because the clerks in their counties had voluntarily abandoned an allegedly illegal practice of disenfranchising ex-felons, and we have said that "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave '[t]he defendant . . . free to return to his old ways.' . . . [But a] case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States* v. *Concentrated Phosphate Export Assn.,* 393 U. S. 199, 203 (1968); accord, *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632 (1953). Accordingly, whether the named plaintiffs have a live controversy with the clerks in their own counties would depend on the likelihood of future disenfranchisement.[15] But we need not consider that question here be-

---

[15] If claims of the named plaintiffs are moot, the proper disposition of this case would seem to be to vacate the judgment of the California Supreme Court and remand for such proceedings as that court deems appropriate. *Brockington* v. *Rhodes,* 396 U. S. 41, 44 (1969).

cause none of the election officials in the named plaintiffs' counties sought review in this Court and none is now before us.

The sole petitioner before this Court is Viola Richardson. None of the named plaintiffs are residents of her county. While those named plaintiffs may or may not have a live controversy with the clerks in their own counties, they surely do not have one with petitioner Richardson. While Richardson may well have a live controversy with ex-felons in her own county over the validity of the disenfranchisement laws, those ex-felons are not before this Court, and she has no dispute with the named plaintiffs. In sum, there is no controversy between the parties before this Court. Petitioner Richardson seeks to use the named plaintiffs' controversy with their own county clerks as a vehicle for this Court to issue an advisory opinion on the issue presented by the suit brought against her by an ex-felon in her own county. Such a decision would violate the " 'oldest and most consistent thread in the federal law of justiciability . . . that the federal courts will not give advisory opinions.' " *Flast* v. *Cohen,* 392 U. S. 83, 96 (1968).

## II

Since the Court nevertheless reaches the merits of the constitutionality of California's disenfranchisement of ex-felons, I find it necessary to register my dissent on the merits as well. The Court construes § 2 of the Fourteenth Amendment as an express authorization for the States to disenfranchise former felons. Section 2 does except disenfranchisement for "participation in rebellion, or other crime" from the operation of its penalty provision. As the Court notes, however, there is little independent legislative history as to the crucial words "or

other crime"; the proposed § 2 went to a joint committee containing only the phrase "participation in rebellion" and emerged with "or other crime" inexplicably tacked on.[16] In its exhaustive review of the lengthy legislative history of the Fourteenth Amendment, the Court has come upon only one explanatory reference for the "other crimes" provision—a reference which is unilluminating at best.[17]

The historical purpose for § 2 itself is, however, relatively clear and, in my view, dispositive of this case. The Republicans who controlled the 39th Congress were concerned that the additional congressional representation of the Southern States which would result from the abolition of slavery might weaken their own political dominance.[18] There were two alternatives available—either to limit southern representation, which was unacceptable on a long-term basis,[19] or to insure that southern Negroes, sympathetic to the Republican cause, would be enfranchised; but an explicit grant of suffrage to Negroes was thought politically unpalatable at the time.[20] Section 2 of the Fourteenth Amendment was the resultant com-

---

[16] See, e. g., Note, Restoring the Ex-offender's Right to Vote: Background and Developments, 11 Am. Crim. L. Rev. 721, 746–747, n. 158 (1973).

[17] Statement of Rep. Eckley, quoted, ante, at 46.

[18] Bonfield, The Right to Vote and Judicial Enforcement of Section Two of the Fourteenth Amendment, 46 Cornell L. Q. 108, 109 (1960); H. Flack, The Adoption of the Fourteenth Amendment 98, 126 (1908); B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 290–291 (1914); J. James, The Framing of the Fourteenth Amendment 185 (1956); Van Alstyne, The Fourteenth Amendment, the "Right" to Vote, and the Understanding of the Thirty-ninth Congress, 1965 Sup. Ct. Rev. 33, 44 (1965).

[19] James, n. 18, supra, at 138–139.

[20] Kendrick, n. 18, supra, at 291; cf. Flack, n. 18, supra, at 111, 118.

promise.    It put Southern States to a choice—enfranchise Negro voters or lose congressional representation.[21]

The political motivation behind § 2 was a limited one. It had little to do with the purposes of the rest of the Fourteenth Amendment.    As one noted commentator explained:

> " 'It became a part of the Fourteenth Amendment largely through the accident of political exigency rather than through the relation which it bore to the other sections of the Amendment.' " [22]    "[I]t seems quite impossible to conclude that there was a clear and deliberate understanding in the House that § 2 was the sole source of national authority to protect voting rights, or that it expressly recognized the states' power to deny or abridge the right to vote." [23]

It is clear that § 2 was not intended and should not be construed to be a limitation on the other sections of the Fourteenth Amendment.    Section 2 provides a special remedy—reduced representation—to cure a particular form of electoral abuse—the disenfranchisement of Negroes.    There is no indication that the framers of the provisions intended that special penalty to be the exclusive remedy for all forms of electoral discrimination. This Court has repeatedly rejected that rationale.    See *Reynolds* v. *Sims,* 377 U. S. 533 (1964); *Carrington* v. *Rash,* 380 U. S. 89 (1965).

Rather, a discrimination to which the penalty provision of § 2 is inapplicable must still be judged against the Equal Protection Clause of § 1 to determine whether judicial or congressional remedies should be invoked.

---

[21] Bonfield, n. 18, *supra,* at 111; James, n. 18, *supra,* at 185; Van Alstyne, n. 18, *supra,* at 43–44, 58, 65.

[22] *Id.,* at 43–44 (quoting from Mathews, Legislative and Judicial History of the Fifteenth Amendment (1909)).

[23] *Id.,* at 65.

That conclusion is compelled by this Court's holding in *Oregon* v. *Mitchell,* 400 U. S. 112 (1970). Although § 2 excepts from its terms denial of the franchise not only to ex-felons but also to persons under 21 years of age, we held that the Congress, under § 5, had the power to implement the Equal Protection Clause by lowering the voting age to 18 in federal elections. As MR. JUSTICE BRENNAN, joined by MR. JUSTICE WHITE, as well as myself, there observed, § 2 was intended as no more "than a remedy supplementary, and in some conceivable circumstances indispensable, to other congressional and judicial remedies available under §§ 1 and 5." 400 U. S., at 278.

The Court's references to congressional enactments contemporaneous to the adoption of the Fourteenth Amendment, such as the Reconstruction Act and the readmission statutes, are inapposite. They do not explain the purpose for the adoption of § 2 of the Fourteenth Amendment. They merely indicate that disenfranchisement for participation in crime was not uncommon in the States at the time of the adoption of the Amendment. Hence, not surprisingly, that form of disenfranchisement was excepted from the application of the special penalty provision of § 2. But because Congress chose to exempt one form of electoral discrimination from the reduction-of-representation remedy provided by § 2 does not necessarily imply congressional approval of this disenfranchisement.[24] By providing a special remedy for disenfran-

---

[24] To say that § 2 of the Fourteenth Amendment is a direct limitation on the protection afforded voting rights by § 1 leads to absurd results. If one accepts the premise that § 2 authorizes disenfranchisement for any crime, the challenged California provision could, as the California Supreme Court has observed, require disenfranchisement for seduction under promise of marriage, or conspiracy to operate a motor vehicle without a muffler. *Otsuka* v. *Hite,* 64 Cal. 2d 596, 414 P. 2d 412 (1966). Disenfranchisement extends to convictions for vagrancy in Alabama or breaking a water pipe in North

chisement of a particular class of voters in § 2, Congress did not approve all election discriminations to which the § 2 remedy was inapplicable, and such discriminations thus are not forever immunized from evolving standards of equal protection scrutiny. Cf. *Shapiro* v. *Thompson,* 394 U. S. 618, 638–639 (1969). There is no basis for concluding that Congress intended by § 2 to freeze the meaning of other clauses of the Fourteenth Amendment to the conception of voting rights prevalent at the time of the adoption of the Amendment. In fact, one form of disenfranchisement—one-year durational residence requirements—specifically authorized by the Reconstruction Act, one of the contemporaneous enactments upon which the Court relies to show the intendment of the framers of the Fourteenth Amendment, has already been declared unconstitutional by this Court in *Dunn* v. *Blumstein,* 405 U. S. 330 (1972).

Disenfranchisement for participation in crime, like durational residence requirements, was common at the time of the adoption of the Fourteenth Amendment. But "constitutional concepts of equal protection are not immutably frozen like insects trapped in Devonian amber." *Dillenburg* v. *Kramer,* 469 F. 2d 1222, 1226 (CA9 1972). We have repeatedly observed:

> "[T]he Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed

---

Dakota, to note but two examples. Note, Disenfranchisement of Ex-felons: A Reassessment, 25 Stan. L. Rev. 845, 846 (1973). Even a jaywalking or traffic conviction could conceivably lead to disenfranchisement, since § 2 does not differentiate between felonies and misdemeanors.

to be the limits of fundamental rights." *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 669 (1966).

Accordingly, neither the fact that several States had ex-felon disenfranchisement laws at the time of the adoption of the Fourteenth Amendment, nor that such disenfranchisement was specifically excepted from the special remedy of § 2, can serve to insulate such disenfranchisement from equal protection scrutiny.

## III

In my view, the disenfranchisement of ex-felons must be measured against the requirements of the Equal Protection Clause of § 1 of the Fourteenth Amendment. That analysis properly begins with the observation that because the right to vote "is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government," *Reynolds* v. *Sims,* 377 U. S., at 555, voting is a "fundamental" right. As we observed in *Dunn* v. *Blumstein, supra,* at 336:

> "There is no need to repeat now the labors undertaken in earlier cases to analyze [the] right to vote and to explain in detail the judicial role in reviewing state statutes that selectively distribute the franchise. In decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction. See, *e. g., Evans* v. *Cornman,* 398 U. S. 419, 421–422, 426 (1970); *Kramer* v. *Union Free School District,* 395 U. S. 621, 626–628 (1969); *Cipriano* v. *City of Houma,* 395 U. S. 701, 706 (1969); *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 667 (1966); *Carrington* v. *Rash,* 380 U. S. 89, 93–94 (1965); *Reynolds* v. *Sims, supra.*"

We concluded: "[I]f a challenged statute grants the right to vote to some citizens and denies the franchise to others, 'the Court must determine whether the exclusions are *necessary* to promote a *compelling* state interest.'" 405 U. S., at 337. (Emphasis in original.)

To determine that the compelling-state-interest test applies to the challenged classification is, however, to settle only a threshold question. "Compelling state interest" is merely a shorthand description of the difficult process of balancing individual and state interests that the Court must embark upon when faced with a classification touching on fundamental rights. Our other equal protection cases give content to the nature of that balance. The State has the heavy burden of showing, first, that the challenged disenfranchisement is necessary to a legitimate and substantial state interest; second, that the classification is drawn with precision—that it does not exclude too many people who should not and need not be excluded; and, third, that there are no other reasonable ways to achieve the State's goal with a lesser burden on the constitutionally protected interest. *E. g., Dunn* v. *Blumstein, supra,* at 343, 360; *Kramer* v. *Union Free School District,* 395 U. S. 621, 632 (1969); see *Rosario* v. *Rockefeller,* 410 U. S. 752, 770 (1973) (POWELL, J., dissenting); cf. *Memorial Hospital* v. *Maricopa County,* 415 U. S. 250 (1974); *NAACP* v. *Button,* 371 U. S. 415, 438 (1963); *Shelton* v. *Tucker,* 364 U. S. 479, 488 (1960).

I think it clear that the State has not met its burden of justifying the blanket disenfranchisement of former felons presented by this case. There is certainly no basis for asserting that ex-felons have any less interest in the democratic process than any other citizen. Like everyone else, their daily lives are deeply affected and changed by the decisions of government. See *Kramer, supra,* at 627. As the Secretary of State of California observed in his

memorandum to the Court in support of respondents in this case:

> "It is doubtful . . . whether the state can demonstrate either a compelling or rational policy interest in denying former felons the right to vote. The individuals involved in the present case are persons who have fully paid their debt to society. They are as much affected by the actions of government as any other citizens, and have as much of a right to participate in governmental decision-making. Furthermore, the denial of the right to vote to such persons is a hindrance to the efforts of society to rehabilitate former felons and convert them into law-abiding and productive citizens." [25]

It is argued that disenfranchisement is necessary to prevent vote frauds. Although the State has a legitimate and, in fact, compelling interest in preventing election fraud, the challenged provision is not sustainable on that ground. First, the disenfranchisement provisions are patently both overinclusive and underinclusive. The provision is not limited to those who have demonstrated a marked propensity for abusing the ballot by violating election laws. Rather, it encompasses all former felons and there has been no showing that ex-felons generally are any more likely to abuse the ballot than the remainder of the population. See *Dillenburg* v. *Kramer*, 469 F. 2d, at 1225. In contrast, many of those convicted of violating election laws are treated as misdemeanants and are not barred from voting at all. It seems clear that the classification here is not tailored to achieve its articulated goal, since it crudely excludes large numbers of otherwise qualified voters. See *Kramer* v. *Union Free*

---

[25] Memorandum of the Secretary of State of California in Opposition to Certiorari, in *Class of County Clerks and Registrars of Voters of California* v. *Ramirez*, No. 73–324.

*School District, supra,* at 632; *Cipriano* v. *City of Houma,* 395 U. S. 701, 706 (1969).

Moreover, there are means available for the State to prevent voting fraud which are far less burdensome on the constitutionally protected right to vote. As we said in *Dunn, supra,* at 353, the State "has at its disposal a variety of criminal laws that are more than adequate to detect and deter whatever fraud may be feared." Cf. *Harman* v. *Forssenius,* 380 U. S. 528, 543 (1965); *Schneider* v. *State,* 308 U. S. 147, 164 (1939). The California court's catalogue of that State's penal sanctions for election fraud surely demonstrates that there are adequate alternatives to disenfranchisement.

> "Today . . . the Elections Code punishes at least 76 different acts as felonies, in 33 separate sections; at least 60 additional acts are punished as misdemeanors, in 40 separate sections; and 14 more acts are declared to be felony-misdemeanors. Among this plethora of offenses we take particular note, in the present connection, of the felony sanctions against fraudulent registrations (§ 220), buying and selling of votes (§§ 12000–12008), intimidating voters by threat or bribery (§§ 29130–29135), voting twice, or fraudulently voting without being entitled to do so, or impersonating another voter (§§ 14403, 29430–29431), fraud or forgery in casting absentee ballots (§§ 14690–14692), tampering with voting machines (§ 15280) or ballot boxes (§§ 17090–17092), forging or altering election returns (§§ 29100–29103), and so interfering 'with the officers holding an election or conducting a canvass, or with the voters lawfully exercising their rights of voting at an election, as to prevent the election or canvass from being fairly held and lawfully conducted' (§ 17093)." 9 Cal. 3d, at

215–216, 507 P. 2d, at 1355–1356 (1973) (footnotes omitted).

Given the panoply of criminal offenses available to deter and to punish electoral misconduct, as well as the statutory reforms and technological changes which have transformed the electoral process in the last century, election fraud may no longer be a serious danger.[26]

Another asserted purpose is to keep former felons from voting because their likely voting pattern might be subversive of the interests of an orderly society. See *Green* v. *Board of Elections,* 380 F. 2d 445, 451 (CA2 1967). Support for the argument that electors can be kept from the ballot box for fear they might vote to repeal or emasculate provisions of the criminal code, is drawn primarily from this Court's decisions in *Murphy* v. *Ramsey,* 114 U. S. 15 (1885), and *Davis* v. *Beason,* 133 U. S. 333 (1890). In *Murphy,* the Court upheld the disenfranchisement of anyone who had ever entered into a bigamous or polygamous marriage and in *Davis,* the Court sanctioned, as a condition to the exercise of franchise, the requirement of an oath that the elector did not "teach, advise, counsel or encourage any person to commit the crime of bigamy or polygamy." The Court's intent was clear—"to withdraw all political influence from those who are practically hostile to" the goals of certain criminal laws. *Murphy, supra,* at 45; *Davis, supra,* at 348.

To the extent *Murphy* and *Davis* approve the doctrine that citizens can be barred from the ballot box because they would vote to change the existing criminal law, those decisions are surely of minimal continuing precedential value. We have since explicitly held that such "differences of opinion cannot justify excluding [any] group

---

[26] *Ramirez* v. *Brown,* 9 Cal. 3d 199, 215–216, 507 P. 2d 1345, 1355–1356 (1973).

from . . . 'the franchise,' " *Cipriano* v. *City of Houma,* 395 U. S., at 705–706; see *Communist Party of Indiana* v. *Whitcomb,* 414 U. S. 441 (1974); *Evans* v. *Cornman,* 398 U. S. 419, 423 (1970).

> "[I]f they are . . . residents, . . . they, as all other qualified residents, have a right to an equal opportunity for political representation. . . . 'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." *Carrington* v. *Rash,* 380 U. S., at 94.

See *Dunn,* 405 U. S., at 355.

Although, in the last century, this Court may have justified the exclusion of voters from the electoral process for fear that they would vote to change laws considered important by a temporal majority, I have little doubt that we would not countenance such a purpose today. The process of democracy is one of change. Our laws are not frozen into immutable form, they are constantly in the process of revision in response to the needs of a changing society. The public interest, as conceived by a majority of the voting public, is constantly undergoing reexamination. This Court's holding in *Davis, supra,* and *Murphy, supra,* that a State may disenfranchise a class of voters to "withdraw all political influence from those who are practically hostile" to the existing order, strikes at the very heart of the democratic process. A temporal majority could use such a power to preserve inviolate its view of the social order simply by disenfranchising those with different views. Voters who opposed the repeal of prohibition could have disenfranchised those who advocated repeal "to prevent persons from being enabled by their votes to defeat the criminal laws of the country." *Davis, supra,* at 348. Today, presumably those who support the legalization of marihuana could be barred

from the ballot box for much the same reason. The ballot is the democratic system's coin of the realm. To condition its exercise on support of the established order is to debase that currency beyond recognition. Rather than resurrect *Davis* and *Murphy,* I would expressly disavow any continued adherence to the dangerous notions therein expressed.[27]

The public purposes asserted to be served by disenfranchisement have been found wanting in many quarters. When this suit was filed, 23 States allowed ex-felons full access to the ballot. Since that time, four more States have joined their ranks.[28] Shortly after lower federal

---

[27] The Court also notes that the disenfranchisement of ex-felons has received support in the dicta of this Court and that we have only recently affirmed without opinion the decisions of two three-judge District Courts upholding disenfranchisement provisions. *Fincher* v. *Scott,* 352 F. Supp. 117 (MDNC 1972), aff'd mem., 411 U. S. 961 (1973); *Beacham* v. *Braterman,* 300 F. Supp. 182 (SD Fla.), aff'd *per curiam,* 396 U. S. 12 (1969). But, dictum is not precedent and as MR. JUSTICE REHNQUIST has only recently reminded us, summary affirmances are obviously not of the same precedential value as would be an opinion of this Court treating the question on the merits. *Edelman* v. *Jordan,* 415 U. S. 651, 671 (1974). See F. Frankfurter & J. Landis, The Business of the Supreme Court at October Term, 1929, 44 Harv. L. Rev. 1, 14 (1930).

[28] The following States do not disenfranchise all former felons: Arkansas, Ark. Stat. Ann. § 3–707 (Supp. 1973); Colorado, Colo. Const., Art. VII, § 10, and Colo. Rev. Stat. Ann. § 49–3–2 (Perm. Cum. Supp. 1971); Florida, Fla. Stat. Ann. § 940.05 (1973); Hawaii, Hawaii Rev. Stat. § 716–5 (Supp. 1972); Illinois, Ill. Rev. Stat., c. 46, § 3–5 (1973); Indiana, Ind. Ann. Stat. § 29–4804 (1969); Kansas, Kan. Stat. Ann. § 22–3722 (Supp. 1973); Maine, Me. Rev. Stat. Ann., Tit. 21, § 245 (1964); Massachusetts, Mass. Gen. Laws Ann., c. 51, § 1 (Supp. 1974–1975) (except election code offenders); Michigan, Mich. Const., Art. II, § 2, and Mich. Comp. Laws Ann. § 168.10 (1970); Minnesota, Minn. Stat. § 609.165 (1971); Nebraska, Neb. Rev. Stat. § 29–2264 (Supp. 1972) and Neb. Rev. Stat. § 83–1118 (1971); New Hampshire, N. H. Rev. Stat. Ann. § 607–A:2 (Supp. 1973); New Jersey, N. J. Stat. Ann. § 19:4–1 (Supp. 1974–

84

courts sustained New York's and Florida's disenfranchisement provisions, the legislatures repealed those laws. Congress has recently provided for the restoration of felons' voting rights at the end of sentence or parole in the District of Columbia. D. C. Code § 1–1102 (7) (1973). The National Conference on Uniform State

1975) (except election code offenders); Ohio Rev. Code Ann. § 2967.16 (Supp. 1972); Oregon, Ore. Rev. Stat. §§ 137.240 and 137.250 (1973); Pennsylvania, Pa. Const., Art. VII, § 1, Pa. Stat. Ann., Tit. 19, § 893 (1964), and Tit. 25, § 3552 (1963) (except election code offenders for four years); South Dakota, S. D. Comp. Laws Ann. §§ 24–5–2 and 23–57–7 (1969); Utah, Utah Const., Art. IV, § 6 (except those convicted of treason or election code offenses); Vermont, Vt. Const., c. II, § 51 (except election code offenders); Washington, Wash. Rev. Code Ann. § 9.96.050 (Supp. 1972); West Virginia, 51 Op. W. Va. Atty. Gen. No. 42, p. 182 (1965) (construing W. Va. Const., Art. IV, § 1); Wisconsin, Wis. Stat. Ann. § 57–078 (Supp. 1974–1975); Wyoming, Wyo. Stat. Ann. § 7–311 (1957).

In 1972 Montana amended its constitution to disenfranchise potential electors only while "serving a sentence for a felony." Mont. Const., Art. IV, § 2; Mont. Rev. Codes Ann. § 23–2701 (Supp. 1973). In 1973, New York amended its laws to allow former felons whose sentence had expired or who were released from parole to vote. N. Y. Election Law § 152 (Supp. 1973–1974). Also in 1973, North Carolina amended its laws to restore all civil rights including the franchise to former felons discharged from prison or parole. N. C. Gen. Stat. § 13–1 (Supp. 1973). And, in the same year, the Tennessee Legislature amended its ex-felon disenfranchisement statutes. See Tenn. Code Ann. § 2–202 (Supp. 1973).

The New York ex-felon disenfranchisement provision was upheld in *Green* v. *Board of Elections,* 380 F. 2d 445 (CA2 1967), and shortly thereafter the New York Legislature repealed that law. N. Y. Election Law § 152 (Supp. 1973–1974). Similarly the Florida disenfranchisement provisions were upheld in *Beacham* v. *Braterman,* 300 F. Supp. 182 (SD Fla.), aff'd *per curiam,* 396 U. S. 12 (1969). Subsequently, Florida statutes were amended to provide for the automatic restoration of all civil rights, including the franchise, upon the completion of sentence or release from parole or probation. Fla. Stat. Ann. § 940.05 (1973).

Laws,[29] the American Law Institute,[30] the National Probation and Parole Association,[31] the National Advisory Commission on Criminal Justice Standards and Goals,[32] the President's Commission on Law Enforcement and the Administration of Justice,[33] the California League of Women Voters,[34] the National Democratic Party,[35] and the Secretary of State of California [36] have all strongly endorsed full suffrage rights for former felons.

The disenfranchisement of ex-felons had "its origin in the fogs and fictions of feudal jurisprudence and

[29] National Conference of Commissioners on Uniform State Laws, Uniform Act on Status of Convicted Persons §§ 2–3 (1964).

[30] American Law Institute, Model Penal Code § 306.3 (Proposed Official Draft 1962).

[31] National Probation and Parole Association, Standard Probation and Parole Act §§ 12 and 27 (1955).

[32] National Advisory Commission on Criminal Justice Standards and Goals, Corrections, Standard 16.17, p. 592 (1973). The Report observed:

"Loss of citizenship rights—[including] the right to vote . . . —inhibits reformative efforts. If correction is to reintegrate an offender into free society, the offender must retain all attributes of citizenship. In addition, his respect for law and the legal system may well depend, in some measure, on his ability to participate in that system. Mandatory denials of that participation serve no legitimate public interest." *Id.*, at 593.

[33] President's Commission on Law Enforcement and the Administration of Justice, Task Force Report: Corrections 89–90 (1967):

"[T]here seems no justification for permanently depriving all convicted felons of the vote . . . . [T]o be deprived of the right to representation in a democratic society is an important symbol. Moreover, rehabilitation might be furthered by encouraging convicted persons to participate in society by exercising the vote."

[34] California League of Women Voters, Policy Statement, Feb. 16, 1972.

[35] National Democratic Party, Party Platform 1972.

[36] Memorandum of the Secretary of State of California in Opposition to Certiorari in *Class of County Clerks and Registrars of Voters of California* v. *Ramirez*, No. 73–324.

doubtless has been brought forward into modern statutes without fully realizing either the effect of its literal significance or the extent of its infringement upon the spirit of our system of government." *Byers* v. *Sun Savings Bank,* 41 Okla. 728, 731, 139 P. 948, 949 (1914). I think it clear that measured against the standards of this Court's modern equal protection jurisprudence, the blanket disenfranchisement of ex-felons cannot stand.

I respectfully dissent.

MR. JUSTICE DOUGLAS, agreeing with Part I–A of this opinion, dissents from a reversal of the judgment below as he cannot say that it does not rest on an independent state ground. See *Hayakawa* v. *Brown,* 415 U. S. 1304 (DOUGLAS, J., in chambers).