[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

_____

No. 18-11388-G

_____

JAMES MICHAEL HAND, et al.,

Appellees,

versus

RICK SCOTT, in his official capacity as
Governor of Florida and member of the
State of Florida's Executive Clemency Board, et al.,

Appellants.

_____

On Appeal from the United States
District Court for the Northern District of Florida

_____

Before MARCUS, WILLIAM PRYOR, and MARTIN, Circuit Judges.

MARCUS, Circuit Judge:

Appellants Rick Scott, in his official capacity as Governor of the State of

Florida, and the other three members of Florida's Executive Clemency Board (Pam

Bondi, Adam H. Putnam, and Jimmy Patronis) (collectively, the "State Executive

Clemency Board") have appealed from the district court's orders entered in favor of appellees James Michael Hand and eight other convicted felons who have completed their sentences and seek to regain their voting rights in Florida. In the underlying lawsuit, the appellees facially challenged, under the Fourteenth Amendment's Equal Protection Clause and the First Amendment, Florida's scheme of voter reenfranchisement for convicted felons, claiming that the State Executive Clemency Board exercised "unbridled discretion" to deny voter reenfranchisement in the absence of any articulable standards. The district court granted summary judgment in favor of appellees, entering a declaratory judgment, permanently enjoining the State Executive Clemency Board from "enforcing the current unconstitutional vote-restoration scheme" and "ending all vote-restoration processes," and commanding the State Executive Clemency Board to "promulgate specific and neutral criteria to direct vote-restoration decisions" along with "meaningful, specific, and expeditious time constraints" on or before April 26, 2018.

Currently before this Court is the State Executive Clemency Board's time-sensitive Motion for Stay Pending Appeal, seeking provisionally to stay the district court's injunctions, until this appeal is heard. The parties agree that four factors are relevant to granting a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

2

substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 426 (2009) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)). The first two factors are the "most critical." Id. at 434. We are satisfied that the State Executive Clemency Board has made a sufficient showing under Nken to warrant a stay, and, accordingly, we stay the district court's entry of injunctive relief until this appeal is resolved by a panel of the Court. The Fourteenth Amendment expressly empowers the states to abridge a convicted felon's right to vote. U.S. Const. amend. XIV, § 2. Binding precedent holds that the Governor has broad discretion to grant and deny clemency, even when the applicable regime lacks any standards. And although a reenfranchisement scheme could violate equal protection if it had both the purpose and effect of invidious discrimination, appellees have not alleged -- let alone established as undisputed facts -- that Florida's scheme has a discriminatory purpose or effect. And the First Amendment provides no additional protection of the right to vote.

## I.

First, the State Executive Clemency Board has shown it will likely succeed on the merits of the Equal Protection claim. The appellees have claimed that Florida's "standardless" voter reenfranchisement regime facially violates the Equal Protection Clause of the Fourteenth Amendment. They do not say that the defendants actually discriminated against any of them on the basis of race or any other invidious

3

grounds. Rather, the heart of their claim is that the State Executive Clemency Board's unbounded discretion will yield an unacceptable "risk" of unlawful discrimination.

For starters, we are bound to follow Supreme Court precedent in Beacham. Beacham v. Braterman, 300 F. Supp. 182 (S.D. Fla. 1969), aff'd 396 U.S. 12 (1969). The case stands for the proposition that Florida did not violate the Equal Protection or Due Process Clauses of the Fourteenth Amendment in denying a petitioner's application for pardon and reenfranchisement, even though the Governor and selected cabinet officers did so in the absence of any articulable or detailed standards. Id. at 184. It establishes the broad discretion of the executive to carry out a standardless clemency regime.

In Beacham, a convicted felon in Florida challenged the refusal to grant him a pardon and the concomitant restoration of his civil rights, including the right to register to vote. Id. at 182-83. He claimed that since there were no "established specific standards to be applied to the consideration of petitions for pardon," the plenary denial of that right violated both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. Id. at 183. A three-judge district court panel squarely rejected the claim, holding that state officials may constitutionally exclude from the franchise convicted felons and that Florida's standardless scheme did not violate the Fourteenth Amendment. The court

4

reasoned that the discretionary pardon power, which included within its ambit the restoration of civil rights, "has long been recognized as the peculiar right of the executive branch of government," and that the exercise of that executive power was free from judicial control. Id. at 184. Accordingly the district court denied the relief sought in the complaint and dismissed the cause. The Supreme Court, in a summary decision, affirmed the holding of the three-judge district court. 396 U.S. 12.

The district court concluded that, "[u]nlike a fine wine, [Beacham] has not aged well," but it remains binding precedent that cannot, as the district court suggested, simply be ignored. We are bound by the Supreme Court's summary determinations. See Picou v. Gillum, 874 F.2d 1519, 1521 n.3 (11th Cir. 1989) ("The Supreme Court's summary dispositions are of course entitled to full precedential respect."). A summary disposition affirms the judgment and that which is essential to the judgment. Ill. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 182 (1979) ("[T]he precedential effect of a summary affirmance can extend no farther than the precise issues presented and necessarily decided . . . ." (quotations omitted)); see also id. at 182–83 ("A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment." (citations omitted)). The Supreme Court has since cited Beacham approvingly, observing, "we have

5

summarily affirmed two decisions of three-judge District Courts rejecting constitutional challenges to state laws disenfranchising convicted felons." Richardson v. Ramirez, 418 U.S. 24, 53 (1974) (citing Beacham, 300 F. Supp. 182, aff'd 396 U.S. 12).

Other precedents confirm the broad discretion of the executive to grant and deny clemency. In Connecticut Board of Pardons v. Dumschat, 452 U.S. 458 (1981), the Supreme Court held that a state was entitled to vest the Board of Pardons with "unfettered discretion" to grant pardons based on "purely subjective evaluations . . . by those entrusted with the decision," leaving inmates with only a "unilateral hope" for pardon. Id. at 464–66. Still again, in Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998), the Supreme Court reaffirmed that, because clemency decisions are "matter[s] of grace" by which the executive may consider "a wide range of factors not comprehended by earlier judicial proceedings and sentencing determinations," the state could allocate pardons in a purely discretionary manner without procedural safeguards under the Due Process Clause. Id. at 281. Finally, in Smith v. Snow, 722 F.2d 630 (11th Cir. 1983), a panel of this Court addressed Due Process and Eighth Amendment claims attacking Georgia's purely discretionary pardon regime. First, we ruled that Smith's Due Process claim was foreclosed by Dumschat. Id. at 631-32. Next, the Court held that the failure of Smith's Eighth Amendment claim necessarily followed. Id. at 632. If a state

6

pardon regime need not be hemmed in by procedural safeguards, it cannot be attacked for its purely discretionary nature.   Id. ("If one has no right to procedures, the purpose of which is to prevent arbitrariness and curb discretion, then one clearly has no right to challenge the fact that the decision is discretionary.").

Perhaps of even greater importance, we are obliged to recognize that § 2 of the Fourteenth Amendment expressly empowers the states to abridge a convicted felon's right to vote.   It reads this way:

> Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed.   But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State.

U.S. Const. amend., XIV § 2 (emphasis added).   And the Supreme Court has explicitly cited the text of § 2 as it has recognized the power of the state to bar felons from voting.   Thus, for example, it has held that "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment."   Richardson, 418 U.S. at 54.

7

It is also true, however, that since <u>Beacham</u>, the Supreme Court has recognized that, at least in limited circumstances, a state's pardon power may be cabined by judicial decree.   Thus, in <u>Hunter</u>, the Supreme Court made it clear that a state's method for reenfranchising a convicted felon would violate equal protection if the scheme had <u>both</u> the purpose and effect of invidious discrimination.   Justice Rehnquist wrote for a unanimous Court:

> Presented with a neutral state law that produces disproportionate effects along racial lines, the Court of Appeals was correct in applying the approach of <u>Arlington Heights</u> to determine whether the law violates the Equal Protection Clause of the Fourteenth Amendment: "[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."

<u>Hunter v. Underwood</u>, 471 U.S. 222, 227–28 (1985) (alterations in original) (quoting <u>Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 264–65 (1977)); <u>see also</u> <u>Osborne v. Folmar</u>, 735 F.2d 1316, 1317 (11th Cir. 1984).

The problem for the appellees in this case, however, is that they have not shown (nor have they even claimed) that Florida's constitutional and statutory scheme had as its purpose the intent to discriminate on account of, say, race, national origin, or some other insular classification; <u>or</u> that it had the effect of a disparate impact on an insular minority.   All we have is the assertion by the appellees and a statement by the district court that there is a real "risk" of disparate treatment and

8

discrimination, precisely because the Florida regime is standardless.   Such a risk of discrimination, however, is likely insufficient under Beacham and Hunter.

Moreover, we have rejected, en banc, that Florida's felon-disenfranchisement regime was enacted with a discriminatory purpose, and the appellees have not offered anything suggesting otherwise.   See Johnson v. Governor of State of Fla., 405 F.3d 1214, 1223–27 (11th Cir. 2005) (en banc).   In Johnson, we examined whether Florida's vote-restoration regime, either historically or as revised over time, had "racial discrimination [as] a substantial or motivating factor" and determined that it did not.   Id. at 1223.   We found no "contemporaneous evidence showing that racial discrimination motivated" the initial disenfranchisement provision, but even assuming that it had been so motivated, we held that "Florida's felon disenfranchisement provision is constitutional because it was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias."   Id. at 1223, 1225.   All the appellees have offered in this case is a "risk" that standardless determinations "could" lead to impermissible discrimination; that is not enough to show a discriminatory purpose or effect.   The State Executive Clemency Board has made a strong showing it is likely to succeed on appellees' equal protection claim.

## II.

We also conclude that the State Executive Clemency Board will likely succeed on the merits of the First Amendment claim.   The appellees allege that

9

Florida's felon-reenfranchisement regime facially violates the First Amendment because it vests the Executive Clemency Board with "unfettered discretion" to engage in a "standard-less process of arbitrary and discriminatory decision-making, which is untethered to any laws, rules, standards, criteria, or constraints of any kind, and unconstrained by any definite time limits," thereby abridging their right to vote and creating an impermissible risk of "arbitrary, biased, and/or discriminatory treatment." **[Plaintiffs' Mot. for Summ. J. at 16, 18]** The appellees expressly disclaim reliance on any anecdotal examples of discrimination and offer nothing suggesting that any of them were the victims of viewpoint discrimination, asserting that "[f]acial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision," since "[t]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." **[Appellees' Resp. to Mot. for Stay at 10]** The appellees, therefore, suggest that "actual discrimination need not be proven." **[Id. at 12]**

Their theory likely fails for at least three reasons. First, our case law establishes that the First Amendment affords no greater voting-rights protection beyond that already ensured by the Fourteenth Amendment. Because a standardless pardon process, without something more, does not violate the

Fourteenth Amendment, it follows that it does not run afoul of the First Amendment. In the second place, Florida's power to disenfranchise voters is expressly sanctioned by § 2 of the Fourteenth Amendment. And finally, no First Amendment challenge to a felon-disenfranchisement scheme has ever been successful.

It is well established in this Circuit that the First Amendment provides no greater protection for voting rights than is otherwise found in the Fourteenth Amendment. In Burton v. City of Belle Glade, 178 F.3d 1175 (11th Cir. 1999), the plaintiffs alleged that the City of Belle Glade's failure to annex their housing project deprived them of the right to vote in violation of the First and Fourteenth Amendments. Id. at 1183. After rejecting the plaintiffs' Fourteenth Amendment claim, the Court disposed of plaintiffs' First Amendment contention, holding that "since the First and Thirteenth Amendments afford no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments, we conclude that the district court did not err in dismissing these claims." Id. at 1188 n.9 (citations omitted). Additionally, in Cook v. Randolph County, 573 F.3d 1143 (11th Cir. 2009), Cook contended that the County Board of Registrars' attempt to change his voting registration infringed his right to vote under the First and Fourteenth Amendments. Id. at 1148. There, a panel of this Court dismissed Cook's First Amendment claim, holding still again that "[t]he First and Thirteenth Amendments afford no greater protection for voting rights claims than

11

that already provided by the Fourteenth and Fifteenth Amendments." Id. at 1152 n.4 (quoting Burton, 178 F.3d at 1188 n.9); see also Irby v. Virginia State Bd. of Elections, 889 F.2d 1352, 1359 (4th Cir. 1989) ("Having found no violations of the Equal Protection Clause and the Fifteenth Amendment, we likewise conclude that plaintiffs' First and Thirteenth Amendment claims must fail. In voting rights cases, the protections of the First and Thirteenth Amendments do not in any event extend beyond those more directly, and perhaps only, provided by the fourteenth and fifteenth amendments.") (internal quotation marks omitted)).

Because Florida likely has established that its felon-reenfranchisement regime does not violate the Equal Protection Clause of the Fourteenth Amendment, it is unlikely indeed that the same exercise of the pardon power violates the First Amendment. Since a standardless reenfranchisement scheme, without more, does not state a claim for an Equal Protection violation based on invidious discrimination, it likely follows that a standardless scheme, without more, cannot establish a First Amendment violation based on viewpoint discrimination. While a discretionary felon-reenfranchisement scheme that was facially or intentionally designed to discriminate based on viewpoint -- say, for example, by barring Democrats, Republicans, or socialists from reenfranchisement on account of their political affiliation -- might violate the First Amendment, cf. Hunter, 471 U.S. at 227–28; Shepherd v. Trevino, 575 F.2d 1110, 1114 (5th Cir. 1978), no such showing has

12

been made in this case. Indeed, the district court, having said nothing about invidious purpose, could discern only that there was a "risk" that a standardless regime <u>could</u> possibly yield viewpoint discrimination. Thus, even if the First Amendment could be employed in this case in lieu of the Fourteenth -- and that is not an easy argument to sustain in the face of controlling case law -- something more than risk likely would have to be shown.

In the wake of <u>Beacham</u>, <u>Dumschat</u>, <u>Woodard</u>, and <u>Smith</u>, a purely discretionary clemency regime does not, without something more, violate the Fourteenth Amendment. As we see it, a constitutional challenge arising under the First Amendment but asserting the same basic claim -- that standardless clemency regimes create an unacceptable risk of discriminatory determinations -- is unlikely to yield a different result. In other words, the appellees likely cannot succeed by bringing the same challenge using only a different label or nomenclature.

It's also pretty clear that, in a reenfranchisement case, the specific language of the Fourteenth Amendment controls over the First Amendment's more general terms. <u>Cf.</u> <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989) (holding that the Fourth Amendment governed rather than the Fourteenth Amendment because the Fourth Amendment's "explicit text[]" addressed the precise question at issue as opposed to the Fourteenth Amendment's "more generalized notion"); <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 843 (1998) (a general constitutional provision applies only if

13

the matter presented is not "covered by" a more specific provision); West v. Davis, 767 F.3d 1063, 1067 (11th Cir. 2014) ("[W]hen a specific provision of the Constitution is allegedly infringed, a court must decide the claim in accordance with the terms of that provision rather than under the more general rubric of substantive due process."). Thus, just as "section 2 of the fourteenth amendment blunts the full force of section 1's equal protection clause with respect to the voting rights of felons," Shepherd, 575 F.2d at 1114, § 2 likewise blunts the First Amendment's application here.

Moreover, although First Amendment attacks on discretionary pardon schemes have been few and far between, the Supreme Court "ha[s] strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision." Ramirez, 418 U.S. at 53 (emphasis added). And every First Amendment challenge to a discretionary vote-restoration regime we've found has been summarily rebuffed. See, e.g., Kronlund v. Honstein, 327 F. Supp. 71, 73 (N.D. Ga. 1971); Farrakhan v. Locke, 987 F. Supp. 1304, 1314 (E.D. Wash. 1997); Johnson v. Bush, 214 F. Supp. 2d 1333, 1338 (S.D. Fla. 2002) (King, J.), aff'd sub nom. Johnson, 405 F.3d at 1214; Hayden v. Pataki, No. 00 Civ. 8586 (LMM), 2004 WL 1335921, at *6 (S.D.N.Y. June 14, 2004); Howard v. Gilmore, 205 F.3d 1333 (unpublished table decision), 2000 WL 203984 at *1 (4th Cir. 2000).

Finally, the First Amendment cases cited by the appellees appear inapposite to a reenfranchisement case. Those cases established the longstanding and important but (for our purposes) unremarkable point that a state cannot vest officials with unlimited discretion to grant or deny licenses as a condition of engaging in protected First Amendment activity. See, e.g., Forsyth Cty. v. Nationalist Movement, 505 U.S. 123, 130–33 (1992); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757–58 (1988). Thus, for instance, Forsyth County discussed an ordinance that granted officials with boundless authority to authorize or forbid, and assess fees on, "public speaking, parades, or assemblies in the archetype of a traditional public forum," which the Supreme Court deemed a "prior restraint on speech." 505 U.S. at 130 (quotation omitted). Likewise, City of Lakewood involved a licensing statute that reposed in the government the unbridled power to permit or deny the placement of newspaper-dispensing devices on public sidewalks. 486 U.S. at 753. There too, the Court struck down the statute as a "prior restraint." Id. at 757. However, this precedent does not bear directly on the matters presented by this case. Indeed, none of the cited cases involved voting rights or even mentioned the First Amendment's interaction with the states' broad authority expressly grounded in § 2 of the Fourteenth Amendment to disenfranchise felons and grant discretionary clemency.

15

The long and short of it is that the State Executive Clemency Board is likely to succeed as well on the merits of the appellees' facial First Amendment claim.

III.

As a separate matter, Florida is also likely to succeed on the merits because there are serious and substantial problems that inhere in the remedies the district court has chosen -- injunctions commanding that the State Executive Clemency Board cannot refuse to reenfranchise felons and that the Governor and his cabinet must fashion out of whole cloth new standards by April 26, 2018. In particular, the injunctions flatly prohibit the State Executive Clemency Board "from ending all vote-restoration processes" for convicted felons. The district court crafted the permanent injunctions this way:

> Defendants are **PERMANENTLY ENJOINED** from enforcing the current unconstitutional vote-restoration scheme. Defendants are also **PERMANENTLY ENJOINED** from ending all vote-restoration processes. On or before April 26, 2018, Defendants shall promulgate specific and neutral criteria to direct vote-restoration decisions in accordance with this Order. On or before April 26, 2018, Defendants shall also promulgate meaningful, specific, and expeditious time constraints in accordance with this Order. Defendants shall file with this Court its modified rules on or before April 26, 2018.

However, as we've noted, § 2 of the Fourteenth Amendment expressly provides for reduction of representation to the states if they deny or abridge the right to vote "except for participation in rebellion, or other crime." U.S. Const. amend. XIV, § 2. Indeed, the district court acknowledged that "[i]t is well-settled that a

16

state can disenfranchise convicted felons under Section Two of the Fourteenth Amendment." And it correctly explained that a state may do so "permanently." Nonetheless, after concluding only that the Florida regime posed a risk of discrimination among applicants, the district court enjoined Florida from exercising the authority that § 2 clearly establishes because the district court concluded that the Florida constitution "presumes a restoration process exists" only because it "bars [any] felon[] from voting 'until restoration of civil rights.'" Fla. Const. art. VI, § 4(a) (emphasis added by district court). But the district court cannot enjoin Florida to follow the district court's interpretation of Florida's own constitution. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984). And we can find no case law even remotely suggesting that the state cannot bar all felons (without drawing any distinctions) from being eligible for reenfranchisement.

What's more, the permanent injunctions entered by the district court command the Governor and three cabinet members to promulgate new standards no later than April 26. These standards must determine when and how to exercise the Governor's power in order to reenfranchise convicted felons. As a court sitting in equity, that seems to us to be a tall order, even assuming the district court had the authority to enter this command in the first place. After all, there are a multitude of considerations for them to study, including but not limited to whether the Clemency Board should adopt mathematical criteria, how "specific and neutral" the criteria

17

should be, whether arrests or convictions for certain kinds of misdemeanor or felony offenses (and there are many) should be either relevant or categorically disqualifying, the kinds of rules previous Florida officials and other states have put in place and how they have worked in practice, and whether the Board should create a newly bifurcated system for processing applications involving civil rights other than voting rights, such as the right to serve on a jury or to hold or run for public office.

Thus, on this ground as well, the State Executive Clemency Board has demonstrated a substantial likelihood of success on the merits.

IV.

Having determined that the State Executive Clemency Board has made a strong showing on the merits as to all of the appellees' claims, we further believe the Clemency Board likely has met its burden overall.

The State Executive Clemency Board likely has shown irreparable harm absent a stay.   Beyond whether the injunction directs the State Executive Clemency Board to do something it is by no means clear the court can compel it to do, the State Executive Clemency Board would be harmed if it could not apply its own laws to grant clemency to eligible applicants now, even if it might later be able to afford these applicants clemency pursuant to a system not yet in place and not of the State Executive Clemency Board's choosing.   See Maryland v. King, 567 U.S. 1301,

1301 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quotations omitted)).

The State Executive Clemency Board also has a substantial interest in avoiding chaos and uncertainty in its election procedures, and likely should not be forced to employ a rushed decision-making process created on an artificial deadline now, just because a more thorough decision-making process could be employed later. We are reluctant to upset the system now in place -- particularly since the district court order creates so truncated a schedule -- when there is a good chance the district court's order may be overturned, and the system would need to be changed still again, potentially re-disenfranchising those who have been reenfranchised pursuant to the district court's injunction. Put another way, there is wisdom in preserving the status quo ante until a panel of this Court, on an expedited basis, has had an opportunity on full briefing to come to grips with the many constitutional and equitable issues that have been raised. To this end, in a separate order, this Court has directed the Clerk to accelerate the briefing schedule and oral argument in the appeal.

As for injury to the appellees, they surely have an interest in regaining their voting rights sooner rather than later, especially since some of them apparently have been waiting a long time to have their rights restored. By the same token, however,

19

since the injunctive relief fashioned by the district court <u>permanently</u> enjoins the defendants from enforcing the current voter-restoration scheme, in the absence of a stay the Governor is barred from reenfranchising <u>anyone</u> (including any of the nine appellees). Nor have the appellees explained why they've waited until now to sue over these rights, nor, finally, have they shown that denying a stay will necessarily increase the speed with which their voting rights may be restored, considering that this Court has accelerated briefing of the merits and oral argument so that the matter can be resolved quickly.

Moreover, a stay of the district court's order would serve any number of substantial public interests: allowing the continued restoration of voting rights to convicted felons while the suit progresses; ensuring proper consultation and careful deliberation before overhauling the State Executive Clemency Board's voter-eligibility requirements; and preserving autonomy of the State Executive Clemency Board's exercise of its power to pardon.

In short, the State Executive Clemency Board has met its burden under <u>Nken</u>. Accordingly, the appellants' motion is GRANTED, and the injunctions entered by the district court are STAYED pending the resolution of this appeal.

The Clerk is directed to treat any motion for reconsideration of this order as a non-emergency matter.

MARTIN, J., concurring in part and dissenting in part:

The U.S. Constitution allows states to ban people convicted of felonies from exercising their right to vote. See Richardson v. Ramirez, 418 U.S. 24, 56, 94 S. Ct. 2655, 2671 (1974). Florida does this through laws that put the burden on convicted felons to have their right to vote restored. See Fla. Const. Art. VI, §§ 4(a), 8(a); Fla. Stat. Ann. §§ 97.041, 944.292. It is these laws that are the core of the case before us.

In Florida, a person with a felony conviction may legally vote only if the Governor and two additional members of the Clemency Board ("Board") restore her voting rights. See Fla. R. Exec. Clemency 4. The Board's power in this regard is without limit. The Board has the "unfettered discretion to grant [restoration of the right to vote] at any time, for any reason." Id. at 4. Likewise, the Governor has "unfettered discretion to deny [this restoration] at any time, for any reason." Id. Thus, the Board and the Governor have complete control over whether and when those with a felony conviction are permitted to vote and thereby take part in "the essence of a democratic society." Reynolds v. Sims, 377 U.S. 533, 555, 84 S. Ct. 1362, 1378 (1964)

The plaintiffs in this case are nine Floridians who have been convicted of felonies and have served their sentences. They are, however, not eligible to vote, because their restoration applications have either been rejected or have been pending

for years.[1]  They sued Florida Governor Rick Scott and the three other members of the Board[2] asserting that Florida's scheme for restoration of voting rights is unconstitutional on its face under the First and Fourteenth Amendments.  The District Court granted summary judgment for the plaintiffs.  It did so based on its finding that Florida's vote restoration scheme violated the First Amendment's guarantees of Free Expression and Free Association and the Fourteenth Amendment's guarantee of Equal Protection because the scheme allows the Governor and the Board complete, unrestrained discretion in deciding whether and when to grant or deny the restoration of voting rights.  The District Court then went on to declare the defendants' vote restoration scheme unconstitutional; enjoin the defendants from enforcing that scheme and from ending all vote-restoration processes; and order the defendants to "promulgate specific and neutral criteria to direct vote-restoration decisions" and "promulgate meaningful, specific, and expeditious time constraints" for vote restoration decisions.  The defendants moved the District Court to stay its orders pending appeal.  Explaining that the defendants did not meet the demanding requirements for this remedy, the District Court denied their request.  Now, Florida asks the same of us.

---

[1] One plaintiff is not eligible to apply for restoration until June of 2019.
[2] Those members are Florida's Attorney General, Florida's Chief Financial Officer, and Florida's Commissioner of Agriculture.

22

I.

A stay pending appeal "is an intrusion into the ordinary process of administration and judicial review." Nken v. Holder, 556 U.S. 418, 427, 129 S. Ct. 1749, 1757 (2009) (quotation omitted). A stay, in other words, is meant to be used only in extraordinary circumstances. See id. It is "not a matter of right, even if irreparable injury might otherwise result to the appellant." Id. at 438, 129 S. Ct. at 1763 (quotation omitted).

In reviewing a party's application for a stay, we consider four factors to "ensure that courts do not grant stays pending appeal improvidently." Chafin v. Chafin, 742 F.3d 934, 937 n.7 (11th Cir. 2013) (per curiam). Those factors are:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Nken, 556 U.S. at 426, 129 S. Ct. at 1756 (2009) (quotation omitted).

The first two of these factors are "the most critical." Id. at 434, 129 S. Ct. at 1761. As to the party's likelihood of success on the merits, "more than a mere possibility of relief is required." Id. (quotation omitted); see also id. (indicating that "the traditional stay inquiry calls for assessing" the third and fourth factors "[o]nce an applicant satisfies the first two factors").

23

II.

The defendants have demonstrated, at most, a mere possibility they may succeed on appeal as to the plaintiffs' First Amendment claims. This demonstration is not enough, in my view, to entitle them to "an intrusion into the ordinary processes of administration and judicial review." Nken, 556 U.S. at 427, 129 S. Ct. at 1757.

The District Court ruled that Florida's vote restoration scheme violated two First Amendment rights: the right to Free Expression and the right to Free Association. In order to reach these conclusions, the District Court necessarily and actually found that voting constitutes the sort of expressive and associational activity protected by the First Amendment. The District Court decision on the plaintiffs' First Amendment claims is on sound legal footing that could well be adopted by the merits panel of judges of this Court through de novo review.

Despite the defendants' arguments to the contrary, precedent does not require us to reject the reasoning of the District Court.[3] Nor, for that matter, does

---

[3] I agree with the majority that that the Supreme Court's summary affirmance in Beacham appears to foreclose the plaintiffs' Fourteenth Amendment claims. See Beacham v. Braterman, 300 F. Supp. 182 (S.D. Fla.), aff'd, 396 U.S. 12, 90 S. Ct. 153 (1969). In Beacham, a three-judge district court panel found that "it is [not] a denial of equal protection of law and due process of law for the Governor of Florida, with the approval of three members of the Cabinet, to restore discretionarily the right to vote to some felons and not to others." Id. at 184. The Supreme Court summarily affirmed. Beacham v. Braterman, 369 U.S. 12, 90 S. Ct. 153. Summary affirmances "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Picou v. Gillum, 813 F.2d 1121, 1122 (11th Cir. 1987) (quotation omitted). Reading the Beacham summary affirmance as foreclosing Fourteenth

24

it establish the requisite "strong showing that [they are] likely to succeed on the merits."   Nken, 556 U.S. at 434, 129 S. Ct. at 1761.   Most importantly, the Supreme Court has left open the possibility that the First Amendment does protects the right to vote.   See Shapiro v. McManus, 577 U.S. __, 136 S. Ct. 450, 456 (2015) (holding that plaintiffs' claim that "Maryland's redistricting plan burdens their First Amendment right of political association" was not frivolous in part because it was "based on a legal theory . . . uncontradicted by the majority in any of our cases").

Indeed, in his concurring opinion in Vieth v. Jubelirer, Justice Kennedy suggested that the right to vote may have First Amendment protections.   See 541 U.S. 267, 313–16, 124 S. Ct. 1769, 1797–98 (2004) (Kennedy, J., concurring in judgment).   Although Justice Kennedy joined the ruling that the partisan gerrymandering in that case was non-justiciable under the Fourteenth Amendment's Equal Protection Clause and Article I, § 2, he reasoned that the First Amendment may provide an effective vehicle for allegations of partisan gerrymandering, as "these allegations involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political

Amendment claims against Florida's vote restoration scheme is the proper way to understand what the Supreme Court necessarily decided.   Thus, I disagree with the majority's more expansive reading of Beacham, and I believe our precedent on interpreting summary affirmances supports my position.

25

views." Id. at 314, 124 S. Ct. at 1797. Justice Kennedy continued, noting that "[i]f a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest." Id. at 315, 124 S. Ct. at 1797. If precedent required a contrary conclusion, the Court would have held that the claim in Shapiro was constitutionally insubstantial. But, based in part on Justice Kennedy's conclusions regarding the First Amendment's protection for "participation in the electoral process," the Court allowed the claim to proceed. See Shapiro, 136 S. Ct. at 456.

Neither does this Circuit's precedent foreclose plaintiffs' First Amendment claims. The defendants ask us to rule otherwise based on a footnote in Burton v. City of Belle Glade, 178 F.3d 1175 (11th Cir. 1999). Burton affirmed the dismissal of a minority vote dilution claim brought under the First, Thirteenth, Fourteenth, and Fifteenth Amendments, and noted that "the First and Thirteenth Amendments afford no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments." Id. at 1187, 1188 n.10. But Burton was only capable of deciding what was before the Court: whether the First Amendment provides more protection than the Fourteenth Amendment for claims alleging that government action has diluted, or impermissibly weakened the effect of, one's right to vote. See, e.g., United States v. Kaley, 579 F.3d 1246, 1253 n.10 (11th Cir.

26

2009) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us." (quotation omitted)).   Burton did not decide whether the First Amendment protects the right to vote under the circumstances of the plaintiffs before us.[4]   These plaintiffs are not making a vote dilution claim. Indeed they have no vote that could be diluted.[5]

### III.

I am therefore aware of no precedent that directly forecloses the plaintiffs' First Amendment claims.   We must next inquire into whether precedent from the Supreme Court and our Court supports their claims.

Our First Amendment rights of free expression and free association are most critical when they are invoked to ensure citizens' free and full participation in the political process.   "Speech is an essential mechanism of democracy."   Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 339, 130 S. Ct. 876, 898 (2010). As with the right of free expression, the Supreme Court has emphasized that the First Amendment right of free association is integral to our democracy's political process.

---

[4] Further support for this conclusion lies in the fact that Burton cited two vote dilution cases as support for this pronouncement: Washington v. Finlay, 664 F.2d 913, 927–28 (4th Cir. 1981), and Lucas v. Townsend, 783 F. Supp. 605, 608 (M.D. Ga. 1992), aff'd on other grounds, 967 F.2d 549 (11th Cir. 1992).   See Burton, 178 F.3d at 1188 n.10.

[5] Cook v. Randolph County, 573 F.3d 1143 (2009), quotes Burton's statement regarding the First Amendment and voting rights.   Id. at 1152 n.4.   Burton's statement was likewise not necessary to the result in Cook, which held, in pertinent part, that Cook's claim was to be dismissed because "he did not actually suffer a deprivation of any of the constitutional or statutory rights he asserts."   See id. at 1152–54.

"Political belief and association constitute the core of those activities protected by the First Amendment." Elrod v. Burns, 427 U.S. 347, 356, 96 S. Ct. 2673, 2681 (1976). "Representative democracy . . . is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views." Cal. Democratic Party v. Jones, 530 U.S. 567, 574, 120 S. Ct. 2402, 2408 (2000).

The question, then, is whether there is a compelling argument that these rights of speech and association encompass the right to vote. I believe there is. As I've said, the Supreme Court has left open the possibility that the First Amendment offers distinct protections for the right to vote. See, e.g., Shapiro, 136 S. Ct. at 356.

Beyond that, the Supreme Court has invalidated regulatory regimes that burden the right to vote expressly on First Amendment grounds. Striking down a state regime establishing early filing deadlines for independent presidential candidates, the Court noted that "we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis." Anderson v. Celebrezze, 460 U.S. 780, 786 n.7, 103 S. Ct. 1564, 1569 n.7 (1983); see also Norman v. Reed, 502 U.S. 279, 288 n.8, 112 S. Ct. 698, 705 n.8 (1992) (expressly employing only the First and Fourteenth Amendments in striking down a state law establishing signature requirements for new parties

28

wishing to run candidates in local elections).   In <u>Anderson</u>, the Court relied on precedent "identif[ying] the First and Fourteenth Amendment rights implicated by restrictions on the eligibly of voters and candidates."   <u>Anderson</u>, 460 U.S. at 786 n.7, 103 S. Ct. at 1569 n.8.   The Court noted that the state laws at issue burdened "two different, although overlapping kinds of rights"—the right to freely associate "for the advancement of political beliefs" and the right to vote.   <u>Id.</u> at 787, 103 S. Ct. at 1569 (quotation omitted).   Thus, the Court has approved of rooting protection for the right to vote in the First Amendment.

This should come as no surprise.   Indeed, the Supreme Court has said that the right to vote is "the essence of a democratic society," and "any restrictions on [it] strike at the heart of representative government."   <u>Reynolds</u>, 377 U.S. at 555, 84 S. Ct. at 1378.   And the right to vote is closely related to, if not encompassed by, the rights of political association and political expression.   It is through voting that citizens engage in a form of political association, as <u>Anderson</u> and <u>Norman</u> suggest. Indeed voting allows citizens to speak, by expressing their choice on an issue, party, or candidate.   See <u>Kramer v. Union Free Sch. Dist. No. 15</u>, 395 U.S. 621, 626–27, 89 S. Ct. 1886, 1889 (1969) (noting that, without the vote, citizens are denied "any effective voice in the governmental affairs which substantially affect their lives"); <u>see also</u> Alexander Meiklejohn, <u>The First Amendment is an Absolute</u>, 1961 Sup. Ct. Rev. 245, 256 (concluding that, "in addition to speech, press, assembly, and

29

petition," the First Amendment protects "the freedom to 'vote,' the official expression of a self-governing man's judgment on issues of public policy," a freedom that "must be absolutely protected"). Thus, I believe there is a compelling argument that the First Amendment independently protects the right to vote, as the District Court found.

IV.

I now turn to the question of whether there is a compelling argument that defendants' scheme impermissibly burdens the plaintiffs' right to vote under the First Amendment. The plaintiffs and the District Court both liken the vote restoration scheme to a permitting or licensing scheme. This analogy is persuasive because the Board is tasked with deciding whether or not to allow—or to permit or license—someone convicted of a felony to vote again.

The Supreme Court has routinely struck down schemes that condition the exercise of First Amendment rights on permits or licenses when an official with unfettered discretion controls that process. See, e.g., Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 133, 112 S. Ct. 2396, 2403 (1992) (striking down ordinance that left the determination of a fee to be charged for assembling or parading "to the whim of [an] administrator"); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 769–72, 108 S. Ct. 2138, 2150–52 (1988) (striking down ordinance that gave mayor complete discretion in doling out permits to publishers

30

seeking public newsracks for their publications).   In the same way, the Supreme Court has regularly invalidated government schemes that do not place time constraints on the administrators of such licensing schemes.   See, e.g., FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225–29, 110 S. Ct. 596, 604–07 (1990) (striking down ordinance that set no time limits on administrator charged with deciding whether to issue licenses to adult entertainment businesses); Riley v. Nat'l Fed'n for the Blind of N.C., 487 U.S. 781, 801–03, 108 S. Ct. 2667, 2680–81 (1988) (striking down state law that requires professional fundraisers to obtain a license before engaging in solicitation, because there were no express or established customary time limits constraining the decisionmaker).

Our Court has done the same.   See, e.g., Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation, 322 F.3d 1298, 1310–11 (11th Cir. 2003) (en banc) (reiterating that "[a] grant of unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional" and invalidating a scheme that set "no explicit limits" on Department of Aviation's power to set fees on publishers seeking to place newsracks at an airport and allowed the Department to "cancel a publisher's license for any reason whatsoever" (quotation omitted)); Sentinel Comm. Co. v. Watts, 936 F.2d 1189 (11th Cir. 1991).

These decisions reflect concern that vesting officials with unbridled discretion to determine whether, and when, to allow someone to speak creates an impermissible risk of viewpoint discrimination. As the Supreme Court explained in Plain Dealer, "a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship." 486 U.S. at 763, 108 S. Ct. at 2147. The Court continued, "[t]his danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." Id. And that risk is similarly significant where there are no time constraints on that official's decision. FW/PBS, Inc., 493 U.S. at 227, 110 S. Ct. at 605 ("A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech.").

The defendants' vote restoration scheme gives them unbridled discretion. In the words of the Rules of Executive Clemency, the Board has "unfettered discretion" to permit an applicant to exercise her right to vote "at any time, for any reason." Fla. R. Exec. Clemency 4. And the Governor has "unfettered discretion" to deny an applicant the right to legally vote "at any time, for any reason." Id. This unbridled discretion is not just concerning when it confronts expressive and associational freedoms traditionally protected by the First Amendment, but also when it threatens the right to vote. See Louisiana v. United States, 380 U.S. 145, 153, 85 S. Ct. 817,

32

822 (1965) ("The cherished right of people in a country like ours to vote cannot be obliterated by the use of laws like this, which leave the voting fate of a citizen to the passing whim or impulse of an individual registrar.").

It is no answer to say we should presume that the Board will exercise its discretion in good faith. The Supreme Court rejected just this defense in Plain Dealer, concluding "this is the very presumption that the doctrine forbidding unbridled discretion disallows." 486 U.S. at 770, 108 S. Ct. at 2151. Instead, "[t]he doctrine requires that [limits on official discretion in such schemes] be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." Id. The defendants make no showing that clear limits restrict their authority. To the contrary, they say the law requires validation of the unfettered discretion vested in the Board and the governor.

Neither is the answer that, because the defendants can disenfranchise all convicted felons, their choice to selectively re-enfranchise some cannot be subject to limitations. The Supreme Court rejected a quite similar "greater-includes-the-lesser" argument in Plain Dealer. See id. at 762–69, 108 S. Ct. at 2147–50. The Court concluded that "when the government is willing to prohibit a particular manner of speech entirely . . . the risk of governmental censorship is simply not implicated." Id. at 768, 108 S. Ct. at 2150. But this case is not about a complete bar—it is about the process by which the Board selectively

doles out the right to vote.    This case should remind us that the Court "has long been sensitive to the special dangers inherent in a law placing unbridled discretion directly to license speech, or conduct commonly associated with speech, in the hands of a government official."    Id. at 767–68, 108 S. Ct. at 2149–50.

The defendants liken their vote restoration scheme to the exercise of clemency power, a power traditionally exercised with minimal limitations from the judiciary.    But the defendants recognize that clemency power is not immune from judicial review and constitutional scrutiny.    See Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 288–89 (1998) (O'Connor, J., concurring) (holding that, in the due process context, "some minimal procedural safeguards apply to clemency proceedings," suggesting that clemency-by-coin-flip might violate due process); see also Wellons v. Comm'r, Georgia Dep't of Corr., 754 F.3d 1268, 1269 (11th Cir. 2014) (recognizing that Justice O'Connor's Woodard concurrence set binding precedent); Shepherd v. Trevino, 575 F.2d 1110, 1114 (5th Cir. 1978) (concluding that states' power to disenfranchise those convicted of felonies does not permit states to restore voting rights to whites only or otherwise "make a completely arbitrary distinction between groups of felons") And the defendants point us to no decisions that would require us to reject plaintiffs' First Amendment claims because they involve matters typically committed to executive discretion.    Cf. Osborne v. Folmar, 735 F.2d 1316, 1317 (11th Cir. 1984) (holding that the line of Supreme

34

Court cases that limited procedural due process claims in the context of clemency did not foreclose equal protection claims challenging clemency determinations, e.g., on the basis of invidious discrimination).   In my view, drawing up neutral criteria to mitigate the risk that vote restoration decisions are predicated on the applicants' viewpoints or beliefs need not be the tall order the defendants describe.   Certainly there are processes by which the First Amendment and executive prerogative can both be respected.

V.

I don't believe the defendants have met their burden under <u>Nken</u> for a stay pending this appeal.   They have demonstrated nothing more than a mere possibility of success on the merits of the plaintiffs' First Amendment claim.   I would, however, modify the permanent injunction imposed by the District Judge ending all vote restoration processes.   See <u>Trump v. Int'l Refugee Assistance Project</u>, 582 U.S. __, 137 S. Ct. 2080, 2087 (2017) (noting that a court "may, in its discretion, tailor a stay so that it operates with respect to only some portion of the proceeding" (quotation omitted)).   As I understand <u>Ramirez</u>, the Constitution empowers states to choose to permanently disenfranchise those convicted of felonies.   <u>Richardson v. Ramirez</u>, 418 U.S. at 56, 94 S. Ct. at 2671.   Other than that feature of the injunction, I would leave the injunction in place.   See <u>Atlanta Journal & Constitution.</u>, 322 F.3d

35

at 1312 (retaining "that portion of the injunction that prohibited the administration of any plan that did not explicitly constrain official discretion").

I respectfully dissent.